THE TRUST COMPANY OF NEW JERSEY, A CORPORATION, PLAINTIFF, v. JEFFERSON TRUST COMPANY, A CORPORATION (IN LIQUIDATION), DEFENDANT.

Decided August 20, 1936.

For the plaintiff, *Perkins, Drewen & Nugent* (by *John Drewen*).

For the defendant, *Richard Doherty.*

BROWN, S. C. C. The defendant moves to strike the complaint in the above entitled cause on the grounds that the contracts upon which the suit is brought are *ultra vires* as to all the parties; they are contrary to public policy; illegal because they induce a breach of trust; they were made without a valuable consideration and that the complaint is framed so as to embarrass and delay a fair trial. The complaint contains three counts and annexed thereto are three writings referred to as contracts and exhibits. The suit is based on those contracts. The three counts are similar in legal effect and a reference to the first will answer for the purpose of deciding the motion. It is alleged that on July 8th, 1931, the plaintiff was and still is a banking corporation existing and conducting business by virtue of the laws of New Jersey concerning trust companies with its main office and branches in the county of Hudson. On the date above mentioned and up to the time possession thereof was taken by the commissioner of banking and insurance, the defendant was likewise a banking corporation with its place of business in the city of Hoboken and existing and conducting business under the same laws as the plaintiff. The parties in the case, as well as all other banks hereinafter mentioned, are banking corporations exercising all the powers necessary to carry on the business of banking in all of its branches with such incidental and necessary powers as are appropriate and consistent with the expressed powers granted in their respective certificates of incorporation. All of those banks are referred to in the contracts and complaint as the Hudson county group. The complaint contains the allegations that the county of Hudson "is socially a unitary, integrated, urban community of dense population;" that on July 8th, 1931, and for a long time theretofore and thereafter occurred a nationwide depression that affected Hudson county and as a result the Hudson county group, which included the parties to this suit as well as twenty-six other banks, reasonably apprehended that there had been created in the depositors of the group an apprehension and fear that the banks mentioned were not safe depositories and that upon an additional bank failure in the county of Hudson there would be a demand by depositors to imme-

diately withdraw their deposits thereby creating a so-called "run" which was likely to result in great monetary and financial loss to the banks in the group. On June 27th, 1931, the Steneck Trust Company located in Hoboken, the same municipality in which the Second Bank and Trust Company was located, was closed by the commissioner of banking and insurance resulting in immediate and increased withdrawals from all the group banks and especially affecting the Second Bank and Trust Company to such an extent that on July 8th, 1931, the commissioner of banking and insurance notified the plaintiff and other members of the group that the Second Bank and Trust Company was in a precarious financial condition and that he would close the bank unless immediate steps were taken to pay or secure payment of the deposit liabilities. On July 8th, 1931, at the request of the commissioner the Hudson county group, including the parties to this suit, fearing a bank panic and to save great monetary loss or possible ruin to themselves did through their representatives request the plaintiff to prevent the closing of the Second Bank and Trust Company by assuming and securing the payment of liabilities of that bank. The plaintiff refused the request unless certain agreements were made by the group, including the defendant, to secure the plaintiff. The agreements were executed. The first, marked *Exhibit No. 1,* in its preamble recites that the plaintiff was unwilling to enter into an agreement to pay and assume the liabilities of the Second Bank and Trust Company unless the group would agree to indemnify it against loss and that on July 8th, 1931, the group did so agree. In this exhibit the group "did severally guarantee" to the plaintiff to repay "any sums that may be required to protect and indemnify" the plaintiff "against any loss by reason of entering into said arrangement with said Second Bank and Trust Company." The agreement provided for a *pro rata* payment by each institution based on aggregate resources as of December 30th, 1930. The obligation was a several obligation and was signed by the representatives of the group including the defendant. The second agreement upon which the suit is based is marked *Exhibit No. 2* and was made between the plaintiff and the Second

Bank and Trust Company wherein it was agreed the plaintiff would assume the liabilities of the bank in the sum of $3,959,715.68 and take as security a note for that amount bearing interest and a transfer of the assets and proceed with the liquidation of those assets. On September 21st, 1931, the plaintiff and all the members of the group executed a third agreement marked *Exhibit No. 3* wherein reference is made to the notice received from the commissioner of banking and insurance of the precarious condition of the Second Bank and Trust Company and the threat to take possession thereof; that the closing of that bank so shortly after the closing of the Steneck Trust Company would precipitate "runs" on the banks in the group and would affect public confidence in the financial institutions of Hudson county. It was "in the interest of all financial institutions doing business in said county of Hudson to prevent such closing." The further recital appears that the agreement *Exhibit No. 1* was an informal agreement "providing for certain indemnities" to the plaintiff and that the group, including the defendant, desired to more exactly define their rights and remedies under the informal agreement. Those rights and remedies are detailed in many respects in this agreement and for a determination of this motion it is unnecessary to make further reference to them. According to the complaint the plaintiff incurred a loss of $2,227,156.22 in acting as liquidator and the share chargeable to the defendant of this loss was $66,847.67 for which sum the suit is brought together with interest. There are twenty reasons assigned for striking the complaint. In determining the motion all the reasons have been considered. Those previously mentioned cover the most important. It is contended that the paragraphs relating to economic conditions are not capable of being joined in an issue; that they attempt to vary the terms of the written agreements and "bolster" and furnish the only consideration for the agreements and that they embarrass and delay a fair trial. It is common knowledge that the insolvency of a bank in a community, resulting in suspension of its business, will seriously affect other banks in the same community. Judicial notice will be taken of this

fact. A person would be quite lacking in knowledge not to know that there was an economic depression in this country in 1929 and that it has continued, in some degree, up to the present time. Judicial notice will be taken of this fact and that the county of Hudson was affected by the same depression. There is nothing to prevent the defendant in law from joining issue on this point and making answer to the contrary. Some of the agreements refer to the economic conditions of the threatened insolvency; the action of the banking commissioner and the appreciation of the financial losses that would affect the group if they did not act promptly. A more detailed recital of those facts in the complaint as distinguished from the agreements does not vary the terms of the latter. The recitals may be more extensive than necessary to state a cause of action. They will not embarrass or delay a fair trial and they will not have the effect of varying the terms of the written agreements. The agreements are not lacking in expressing a valuable consideration. Self preservation is a consideration that has always been most highly valued in law and ethics. It needs no bolstering. It speaks for itself. The recitals of the financial apprehension that was felt are extensive, nevertheless they are reasonable allegations relating to the transactions that are the subject-matter of the suit. The defendant contends that the agreement *Exhibit No. 1* is an accommodation guarantee made for the benefit of the Second Bank and Trust Company; that *Exhibit No. 3* is an indemnity agreement and that both agreements were without the corporate powers of the parties thereto and therefore *ultra vires;* against public policy and their execution was a breach of trust. All of the agreements should be considered together. The recitals of the earlier agreement alleges it was made at the request of the group and that the plaintiff refused to be a party unless the group protected and indemnified it against loss; that the alleged guarantee was one of "payment and not collection." While the word guaranty is used in this agreement the obvious meaning and intention was that the defendant and other members of the group would be directly liable for their share of the losses. *Exhibit No. 2* recites that *Exhibit No. 1* was

an agreement providing for "indemnities." It matters little whether the agreements or any of them were of guaranty or indemnity as the liability of the defendant does not rest on this distinction. It is well settled as a general principle of law that a bank has no power to become an accommodation guarantor for anyone. Whether this established principle was violated by the parties depends very much upon the construction of the statutes involved and whether the defendant did not sign the agreements primarily for its own safety and benefit and not solely for the accommodation of some other party without benefit to the defendant. Chapter 27 (*Pamph. L.* 1920; *Cum. Supp. Comp. Stat.* 1911-1924, *p.* 3745, § 221-6a, 1), an act concerning trust companies, provides in part that in addition to the general powers granted to do business a trust company "shall have all such powers as shall be necessary to carry on the business of banking." Trust companies are also given the general powers contained in the Corporation act (*Pamph. L.* 1896, *ch.* 185, *p.* 278; 2 *Comp. Stat., p.* 1599, § 2) which provides in part "every corporation, its officers, directors and stockholders, shall possess and exercise all the powers and privileges contained in this act, so far as the same are necessary or convenient to the attainment of the objects set forth in such charter." The federal statutes relating to the powers of national banks are quite similar to the laws of New Jersey concerning the powers vested in banks. Title 12 *U. S. C. A.,* § 24, provides in part besides the general powers granted "all such incidental powers as shall be necessary to carry on the business of banking." In the case of *McCauley* v. *Ridgewood Trust Co.,* 81 *N. J. L.* 86; 79 *Atl. Rep.* 327, it was held that a trust company has power to become a guarantor of a bond made to it by a corporation as trustee. In referring to the meaning of the word "necessary" in the New Jersey Corporation act the court said, "the word 'necessary' did not mean indispensable." Vice-Chancellor Green, in his opinion, says: "The construction to be given to the words 'necessary to the exercise' is settled in this state. Chief Justice Beasley, delivering the opinion of the Court of Errors and Appeals in *State Railroad Co.* v. *Hancock,* 6 *Vr.* 527 (at *p.* 545),

says: "Power necessary to a corporation does not mean simply power which is indispensable * * *. A power which is obviously appropriate and convenient to carry into effect the franchise granted has always been deemed a necessary one. * * * In short, the term comprised a grant of the right to use all means suitable and proper to accomplish the end which the legislature had in view at the time of the enactment of the charter." In *Jesselsohn* v. *Boorstein,* 111 *N. J. Eq.* 310; 162 *Atl. Rep.* 254, it was stated by Vice-Chancellor Backes: "As a general rule, a business corporation has no power to pledge its assets for the accommodation of a third party and creditors may impeach the transaction. * * * In these circumstances, the charge that the mortgage was for the accommodation of another finds no confirmation. Rather, and in fact, it was given to protect the very substantial interest of the insolvent company in its subsidiary by saving the latter's assets from a threatened judgment and execution sale." In *Wanamaker* v. *Edisto National Bank,* 62 *Fed. Rep.* (2d) 692, the court said: "It cannot be denied that the function of the directors of a corporation is to manage its affairs in active operation, and that they have no inherent power to wind up its affairs by sale or liquidation of all of its assets. Power to take fundamental corporate action of this sort is uniformly reserved by corporation statutes to the stockholders as a body, and in the case of national banks the provisions of 12 *U. S. C. A.,* § 181 is that any association may go into liquidation and be closed by vote of its shareholders owning two-thirds of its stock. These provisions, however, are designed to govern the actions of a board of directors in conducting the affairs of a solvent going concern and not to render powerless to act so as to safeguard the assets when the corporation is insolvent or in imminent danger of becoming so." The court in this case agreed with the holding in the case of the *City National* v. *Fuller,* 52 *Fed. Rep.* (2d) 870, that it had the power to exercise "incidental powers" under 12 *U. S. C. A.,* § 24; that an emergency existed in the pending case and hence the directors had the power to prevent the sacrifice of assets and to transfer them to a going concern by which they could be reduced to money

under more valuable conditions. *Hightower* v. *American National Bank,* 263 *U. S.* 351, is a case where one bank assumed the liabilities of another bank and had transferred to it all of the assets because of threatened insolvency. The court stated that "the primary purpose in what was done was to relieve the Commercial National from an existing embarrassment to conserve its assets, and to subserve the interest of its creditors and stockholders." It held that a national bank has power to enter into a contract with another bank for the advancement of money to liquidate its obligations with a view to closing its affairs. In *Wyman* v. *Wallace,* 201 *U. S.* 230, a case frequently cited on the subject under consideration, the court said: "The question, therefore, is whether a national bank finding itself embarrassed, with a large amount of assets, much in excess of its obligations, yet without the cash to make payment of those which are due and urgent, can borrow to meet those pressing demands. A very natural answer is, why not? It is not borrowing money to engage in new business. It is simply exchanging one creditor for others. There may be wisdom in consolidating all its debts into the hands of one person. At least such a consolidation cannot be beyond its powers. When time is obtained by the new indebtedness it gives the borrowing bank and its officers and stockholders time to consider and determine the wisdom of further prosecution of its business." In *Schofield* v. *State National Bank,* 97 *Fed. Rep.* 282, it was held that such assistance by one bank to another was one of the statutory incidental powers. There appears no case directly in point in the reported cases of this state. Precedent is hardly necessary where the law is so clear and the facts so obvious. In the State of New York a recent decision indicates the same conclusion. *O'Connor, Comptroller,* v. *Bankers Trust Co. et al.,* Special Term, Part III, of the Supreme Court, New York county, decided June 29th, 1936, is a case in which the comptroller of the currency reported to the clearing house the financial embarrassment of a bank and upon a number of banks undertaking to underwrite the Harriman Bank deposit liabilities that bank was permitted to remain open. The underwriting resulted in a loss. There was no

written agreement and no action was taken to commit the member banks to an obligation to indemnify or guaranty. It was on this point the case was decided against the plaintiff who sought to recover losses sustained and in this connection the O'Connor case differs from the case under consideration. It is worthy to note, however, that the result would have been different if there were written agreements and commitments. The decision holds that it was one of the "incidental" and "necessary" powers of a member of a group of banks to guarantee the deposits of an insolvent bank for the benefit of all the banks. Referring to such an arrangement the court said: "The best evidence of the necessity of any practice is obviously proof that banks have frequently found it vital to their proper interests to resort to it. * * * The right of self preservation applies to banks as well as to business corporations and individuals generally. * * * It is not necessary that the bank be faced with actual ruin. * * * The slightest spark may result in a widespread conflagration difficult to control. No bank is immune when confidence is generally disturbed, and particularly when lack of confidence assumes the form of a heedless "run" on another member bank. * * * In the exercise of fair and honest judgment at the time, for the purpose of preserving the security and integrity of their own institutions, such action, within reasonable limitations, is not an invalid exercise of corporate power." The agreements referred to in the complaint in the instant case were evidently fairly and honestly made for a purpose that was clearly within the corporate powers of the group. They were based on a consideration of the highest value to the defendant as well as other members of the group. In the making of the agreements, in the light of the conditions then existing, reasonable judgment and wisdom was exercised. The benefits and protection were for all the member banks. The agreements are not void as against public policy but consistent with public policy. The officers executing the agreements breached no trust or duty but on the contrary performed a plain duty. The agreements were not without the powers of the member banks that were parties to them. The motion to strike will be denied on all the reasons assigned and an order will be made accordingly.