TOWN & COUNTRY BANK OF QUINCY, Plaintiff-Appellant and Counter-defendant-Appellant, v. E. & D. BANCSHARES, INC., *et al.*, Defendants-Appellees (Federal Deposit Insurance Corporation, Counterplaintiff-Appellee).

Fourth District No. 4—87—0807

Opinion filed August 4, 1988.

Richard P. O'Connell, Ltd., of Quincy, and Mass, Miller & Josephson, Ltd., of Chicago, for appellant.

Jerry L. Brennan, of Keefe, Gorman & Brennan, of Quincy, for appellee Federal Deposit Insurance Corporation.

Steven E. Siebers, of Loos, Schnack & Siebers, of Quincy, for appellee First Midwest Bank of Quincy.

JUSTICE McCULLOUGH delivered the opinion of the court:

The plaintiff, Town & Country Bank of Quincy (T&C), appeals a summary judgment entered in favor of defendants in a mortgage fore-closure action. The principal issue involved in this case is whether there are triable issues of fact concerning whether defendant Mendon State Bank (MSB) acted within its powers in mortgaging its banking

premises to T&C, and if so, whether there was adequate consideration for the mortgage. An additional issue is whether the circuit court abused its discretion in vacating a default judgment or not awarding attorney fees and costs to the party in whose favor the default judgment was entered as a condition of vacating the judgment.

This litigation had its genesis in a $425,000 loan which T&C made to E. & D. Bancshares, Inc. (E&D), in 1985. E&D owns the majority of the stock of MSB. E&D is owned solely by Don Schoch and Steve Schoch. The MSB shares owned by E&D were pledged as collateral for T&C's loan to E&D.

As a result of actions by the Federal Deposit Insurance Corporation (FDIC), which first classified T&C's loan to E&D as "substandard" and later required T&C to charge off at least a portion of the loan, T&C on August 7, 1986, demanded immediate payment of that loan. On the morning of August 20, 1986, T&C and E&D agreed that if MSB hypothecated and mortgaged MSB's bank building to T&C, T&C would not at that time accelerate payment on the E&D loan.

Don Schoch then called a special meeting of MSB's board of directors, which was held at approximately 1:30 that afternoon. At that meeting, MSB's board of directors voted to mortgage MSB's bank building and land to T&C in order to secure E&D's debts to T&C. Both Eldon Schoch, MSB's president, and Sherry Bryson, MSB's vice-president and cashier, signed the mortgage at that time.

Present at the August 20, 1986, board meeting was Louis P. Mc-Clelland, T&C's vice-president. He agreed that T&C would not accelerate the due date of E&D's notes if T&C received additional collateral for its loan to E&D.

The minutes of the August 20, 1986, meeting of MSB's board of directors reflect that board members expressed concern regarding MSB's liquidity. The board felt that if T&C made public its foreclosure on the MSB stock which E&D had pledged to it, a possible run on MSB would result.

MSB was closed by the Commissioner of Banks and Trust Companies at 3:10 p.m., on August 20, 1986. At approximately 4 p.m. on the same date, First Midwest Bank of Quincy (First Midwest) agreed to purchase the assets of MSB, including its bank building. The FDIC was appointed receiver of MSB on behalf of the Commissioner of Banks and Trust Companies.

On September 15, 1986, T&C filed a complaint seeking foreclosure of its mortgage on MSB's banking premises. On September 30, 1986, the FDIC filed an answer and counterclaim against T&C. The counterclaim requested that MSB's mortgage to T&C be ordered

stricken from the records of the recorder of deeds; that T&C's complaint seeking foreclosure of the mortgage be dismissed with prejudice; that T&C be ordered to cease and desist from all attempts to foreclose the mortgage or otherwise impair the FDIC's title to the MSB premises; and such other relief as might be appropriate. On December 29, 1986, the FDIC filed an amended counterclaim requesting the same relief, which also named MSB and First Midwest as counterdefendants.

T&C filed a motion requesting a default judgment against MSB on June 3, 1987. A written order of default judgment was entered on June 23, 1987. On July 13, 1987, the circuit court vacated the default judgment on the FDIC's request and granted the FDIC leave to be substituted as the party for MSB. The FDIC accordingly entered its appearance for MSB on July 15, 1987. The FDIC, as substituted party for MSB, answered T&C's complaint for foreclosure on July 24, 1987.

In the meantime, the FDIC, in its capacity as receiver of MSB, filed an amended motion for summary judgment on May 20, 1987. The court allowed this motion in an order entered September 11, 1987. In this order, the court found: (1) no genuine issues of material fact were in dispute; (2) MSB's pledging its assets for the debts of another was outside its general corporate powers; (3) MSB "received no benefit" for mortgaging its banking premises to T&C; and (4) it is against the public policy of Illinois for a bank to pledge its assets "without benefit to the bank." The court held that MSB's mortgage to T&C, as well as any recorded *lis pendens* documents relating to the mortgage, are null and void.

In appealing the circuit court's summary judgment order, T&C contends summary judgment was improperly entered in the FDIC's favor because the power to pledge bank assets in order to guarantee the debt of another in exchange for benefits to the pledgor bank is among the incidental powers of State banks. T&C asserts MSB had a valid business purpose in mortgaging its banking premises to secure E&D's indebtedness to T&C, since MSB felt such action was necessary in order to avoid (1) the adverse publicity which would result from T&C foreclosing on the MSB shares which it held as security for its loan to E&D and (2) the run on MSB which would result from such adverse publicity. T&C also asserts that in finding that MSB's mortgaging its premises under these circumstances is against the public policy of Illinois, the circuit court impermissibly amended the statutory provisions governing the powers of banks.

The FDIC asserts that a bank's mortgaging one of its assets for the benefit of a third party is *ultra vires* and against public policy. In

support of this position, it points out that a bank is a "commercial pursuit of a public character" and that depositors place their faith and trust in banks to care for their money in a proper manner. The FDIC contends a holding that MSB properly mortgaged premises to T&C would mean that banks could give away their major assets and deny their depositors recourse to such assets. The FDIC maintains such actions are not among the "incidental powers *** necessary to carry on the banking business" which applicable legislation (Ill. Rev. Stat. 1985, ch. 17, par. 311(11); 12 U.S.C. §24 (Supp. IV 1986)) confers on national banks. The FDIC further argues that by enumerating the specific situations in which banks may pledge their assets (Ill. Rev. Stat. 1985, ch. 17, par. 311(7)), the legislature intended to prohibit banks from pledging their assets under other circumstances, including those involved in the present case.

First Midwest adopts the arguments of the FDIC. Additionally, First Midwest acknowledges that banks may guarantee debts which a customer owes to third parties in order to enhance the collectability of debts owed the bank by the same customer (see *Corn Belt Bank v. Lincoln Savings & Loan Association* (1983), 119 Ill. App. 3d 238, 456 N.E.2d 150), but asserts that this is not such a case. First Midwest points out that E&D's debt was not owed to T&C by MSB and that T&C could not have exercised any enforcement rights against MSB.

Section 5(11) of the Illinois Banking Act provides:

"A bank organized under this Act or subject thereto shall be a body corporate and politic and shall, without specific mention thereof in the charter, have all the powers conferred by this Act and the following additional general corporate powers:

* * *

(11) Notwithstanding any other provisions of this Act, to do any act and to own, possess and carry as assets property of such character, including stock, which is at the time authorized or permitted to National Banks by an Act of Congress, but subject always to the same limitations and restrictions as are applicable to National Banks by the pertinent Federal law." Ill. Rev. Stat. 1985, ch. 17, par. 311(11).

The Federal legislation pertaining to the powers of national banks provides in part:

"Corporate powers of associations

Upon duly making and filing articles of association and an organization certificate a national banking association shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and in the name desig-

nated in the organization certificate, it shall have power—

* * *

Seventh. To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of title 62 of the Revised Statutes." (12 U.S.C. §24 (Supp. IV 1986).)

At the relevant times, regulations issued by the Comptroller of the Currency pertaining to the powers of national banks provided:

"National bank as guarantor or surety on indemnity bond.

(a) A national bank may lend its credit, bind itself as a surety to indemnify another, or otherwise become a guarantor, if it has a substantial interest in the performance of the transaction involved or has a segregated deposit sufficient in amount to cover the bank's total potential liability. For example, a bank, as a fiduciary, has a sufficient interest in the faithful performance by its cofiduciary of his duties to act as surety on the bond of such cofiduciary." 12 C.F.R. §7.7010 (1987).

Several early decisions, which predate adoption of section 7.7010 of the Comptroller of the Currency's Regulations, hold a bank may guarantee the obligations of, or make contributions to, financially troubled banks in the same geographic area in order to forestall the sudden failure or closure of the financially troubled banks and prevent a resulting run on all area banks. The banks making such guarantees or contributions obviously benefit in the sense that the possibility of a run on them is diminished. (*E.g., McCoy v. Adams* (E.D. Pa. 1939), 29 F. Supp. 815; *Southern Exchange Bank v. First National Bank* (1928), 37 Ga. App. 612, 141 S.E. 323; *Trust Co. of New Jersey v. Jefferson Trust Co.* (1936), 14 N.J. Misc. 656, 186 A. 732.) In holding that a bank did not act beyond its powers in agreeing to reimburse a second bank for losses incurred in liquidating a third bank in the same city, the court in *Southern Exchange Bank* specifically relied on a version of the statute governing the powers of national banks (12 U.S.C. §24 (1926)) virtually identical to the relevant portions of the present statute governing that subject (12 U.S.C. §24 (Supp. IV 1986)). The applicable portion of the regulations of the Comptroller of the Currency (12 C.F.R. §7.7010 (1987)) appears at least in part to be a codification of these early decisions concerning the powers of national

banks to guarantee the debts of third parties.

Section 5(11) of the Illinois Banking Act extends to State banks all of the powers which national banks enjoy under acts of Congress, court decisions interpreting the applicable Federal legislation, and regulations issued by the Comptroller of the Currency which interpret that legislation. As the FDIC points out, the Illinois Banking Act does specify seven circumstances under which a bank may "borrow; and *** pledge its assets" (Ill. Rev. Stat. 1985, ch. 17, par. 311(7)), and the mortgaging of bank assets to secure a debt owed by a third party in order to avoid a run on the bank is not listed among those circumstances. However, section 5(11) provides that "[n]otwithstanding any other provisions of this Act," State banks may do any act which is at the time permitted to national banks. (Ill. Rev. Stat. 1985, ch. 17, par. 311(11).) Thus the legislature has clearly indicated an intent that State banks not be limited to the pledging of their assets only in the situations specified in the Illinois Banking Act, if the power to pledge assets under other circumstances is permitted to national banks.

■ In becoming a guarantor, one promises to pay a debt in the event another fails to do so. (*Lowenstein v. Chicago Title & Trust Co.* (1950), 340 Ill. App. 160, 91 N.E.2d 97.) A mortgage is "any conveyance of an estate to secure a debt, or the performance of some act, such as, the payment of money, or the furnishing of indemnity, subject to be defeated by the performance of the act agreed to be done." (*Fitch v. Wetherbee* (1884), 110 Ill. 475, 493.) In mortgaging its banking premises to T&C in order to further secure the E&D loan, MSB in effect agreed to either make good on that loan or suffer the loss and sale of its banking premises in order to satisfy the amount of that loan. In mortgaging its banking premises to T&C, MSB became a guarantor of E&D's indebtedness to T&C.

■ The record contains sufficient evidence to present a question of fact, on the basis of which, a trier of fact could reasonably conclude, MSB mortgaged its banking premises to T&C because it feared that T&C's holding a public sale of the MSB stock which it held to secure T&C's loan to E&D would result in a possibly fatal run on MSB. Sherry Bryson, MSB's vice-president and cashier, testified at a deposition that there had been a small run on MSB during the second week of August 1986. According to Bryson, concern was expressed at the August 20, 1986, board meeting that T&C's foreclosing on the MSB shares which were security for its loan to E&D would mean "that our deposits would disappear quite quickly. The liquidity was problem enough without additional withdrawals." Eldon Schoch, MSB's president, stated at a deposition the following reasons for

MSB mortgaging its premises to T&C:

> "We had the fear, of course, of a demand being made by Town and Country Bank. It [E&D's note to T&C] was supposed to have been paid by August 15th, and this being the case, the publicity from that hit the newspaper, could have caused additional problems and leading into a more of a run."

Additionally, the minutes of the August 20, 1986, board meeting reflect that "the Board felt that if Town and Country Bank made public the foreclosure of the Mendon State Bank stock a possible run on the Mendon Bank would result." On the basis of the above evidence, a trier of fact could conclude that MSB had a substantial interest in the provision of additional security for T&C's loan to E&D's in the sense that MSB reasonably believed its providing additional security to T&C was necessary in order to avoid a possibly fatal run on MSB.

On the basis of these same facts, a trier of fact also could properly conclude MSB did not reasonably believe its mortgaging its banking premises to T&C would prevent a possibly fatal run on MSB and that MSB thus did not have a substantial interest in providing T&C with additional security for its loan to E&D. As counsel for First Midwest pointed out at oral argument, one could reasonably conclude that news that MSB had mortgaged its banking premises to T&C would have caused a loss of public confidence in, and a resulting run on, MSB to at least the same extent as news that T&C had sold the MSB shares which E&D pledged to it.

In arriving at the above conclusions, we have considered all of the authorities cited by the parties. The only authority relied upon by either the FDIC or First Midwest which bears a factual similarity to the present case is *Colley v. Chowchilla National Bank* (1927), 200 Cal. 760, 255 P. 188 (52 A.L.R. 569). In that case, a bank agreed to release a debt owed to it by an individual, if that individual quitclaimed certain real estate to a second and apparently unrelated bank. There was no evidence that any benefit would accrue to the first bank as a result of the quitclaim deed in favor of the second bank. The court held that the agreement between the first bank and its debtor in effect amounted to a gift of the first bank's capital assets to the second bank in exchange for no discernable benefit to the first bank. On this basis, the court concluded that the contract between the first bank and its debtor was *ultra vires*. In the present case, by contrast, there is a question of fact concerning whether MSB's officers reasonably believed the mortgaging of MSB's premises to T&C would benefit MSB and thus constituted a transaction in the performance of which MSB had a substantial interest.

The record also does not support the circuit court's entry of summary judgment on the basis that MSB received no benefit or consideration for mortgaging its premises to T&C. As T&C points out, the FDIC did not raise the issue of consideration for MSB's mortgage to T&C in the circuit court proceedings. Moreover, neither the FDIC nor First Midwest specifically addresses this issue in its brief.

■ The basic ingredients of a contract are an offer, acceptance and consideration. Any act or promise which is of benefit to one party, or of disadvantage to the other, is sufficient consideration to support a contract. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 329-30, 371 N.E.2d 634, 639.) Forbearance from exercising a right to take legal action against a third party constitutes adequate consideration for a guaranty of an obligation of the third party. In order to constitute consideration for a contract of guaranty, an agreement to forebear need not be in express terms or for an exact period of time. *McMicken v. Safford* (1902), 197 Ill. 540, 546, 64 N.E. 540, 542; *Zimmerman Ford, Inc. v. Cheney* (1971), 132 Ill. App. 2d 871, 873, 271 N.E.2d 682, 683-84; see also *Corn Belt Bank v. Lincoln Savings & Loan Association* (1983), 119 Ill. App. 3d 238, 248-49, 456 N.E.2d 150, 158.

■ In the present case, Louis P. McClelland, T&C's vice-president, stated in an affidavit that on August 20, 1986, T&C agreed not to accelerate payment of the E&D notes if MSB hypothecated and mortgaged its bank building to T&C "on the E. & D. Bancshares, Inc. loan." Also, the minutes of the August 20, 1986, meeting of MSB's board of directors state that the mortgage to T&C of MSB's bank building and land was made "[i]n consideration for Town & Country Bank forebearing [*sic*] the calling of the loan of E & D Bancshares, Inc. and the foreclosing on the shares of the Mendon State Bank."

The above evidence is sufficient to support a finding that T&C conferred on MSB the benefit of additional time to get its finances in order before T&C sold the MSB shares which it held as security for its loan to E&D, and that T&C at the same time incurred detriment in foregoing its right to immediately collect on the loan. If T&C parted with a right which it could otherwise have immediately exercised, the fact that MSB only briefly enjoyed the benefit conferred on it in exchange for its mortgaging its premises to T&C would be of no consequence with regard to the existence of sufficient consideration for the mortgage. See *Hamilton Bancshares, Inc. v. Leroy* (1985), 131 Ill. App. 3d 907, 476 N.E.2d 788.

The facts of record obviously admit of more than one conclusion or inference with regard to whether MSB acted within its powers in

mortgaging its premises to T&C and whether there was consideration for that mortgage. Therefore, the circuit court should have denied the FDIC's motion for summary judgment and allowed this cause to proceed to trial. (*Smith v. Rengel* (1981), 97 Ill. App. 3d 204, 422 N.E.2d 1146.) In reversing the circuit court's summary judgment order we do not, as the FDIC states, send a message to banks that they may give away their major assets and deny their depositors recourse to such assets. Rather, we merely hold this case presents a question of fact as to whether MSB reasonably believed its providing additional security for T&C's loan to E&D was a transaction in which MSB had a substantial interest in the sense that the provision of additional security would prevent a possibly fatal run on MSB.

We finally consider whether the circuit court erred in vacating the default judgment against MSB or in refusing to award T&C the attorney fees and costs which it incurred in obtaining that default judgment.

At a hearing held June 16, 1987, on T&C's motion for a default judgment against MSB, the circuit court twice inquired as to whether the FDIC wanted to enter its appearance on behalf of MSB. On each occasion, the FDIC responded in the negative. A formal written order granting T&C a default judgment against MSB was entered on June 23, 1987, the circuit court apparently having previously announced its intention to grant a default judgment at a hearing held June 16, 1987. In its June 22, 1987, motion for leave to be substituted as party defendant for MSB and to vacate the default judgment against MSB, the FDIC stated the following as the sole grounds for the motion:

"1. That the FDIC has been appointed Receiver of the Mendon State Bank by the Commissioner of Banks and Trust Companies for the State of Illinois.

2. That the FDIC, as said Receiver, is a proper party to defend the foreclosure action against the Mendon State Bank.

3. That the action of foreclosure being taken by plaintiff, Town & Country Bank, is an action against the assets of the Mendon State Bank over which the FDIC took receivership on August 20, 1986."

In an order entered July 13, 1987, the circuit court granted the FDIC's June 22, 1987, motion. In this order, the court found that "substantial justice would be afforded to all parties without prejudice to the plaintiff herein were the court to exercise its discretion in allowing the motion herein."

T&C requested reconsideration of the circuit court's vacation of the June 23, 1987, default judgment, or alternatively, an award of at-

torney fees and costs against the FDIC, in a motion filed July 16, 1987. The court denied this motion on July 27, 1987.

In arguing that the circuit court improperly vacated the default judgment in favor of MSB, T&C observes that at no point did MSB itself file a timely motion requesting that the default judgment be set aside. It also asserts that at no time did the FDIC demonstrate due diligence or the existence of a meritorious defense. T&C further argues that in view of the FDIC's delay in requesting that it be substituted for MSB after having had many previous opportunities to do so, the court should have at least awarded it the attorney fees and costs which it expended in obtaining the default judgment against MSB.

The FDIC maintains that in this case, it took the actions necessary to properly defend itself, prosecute its claim, and present the issues to the court. It asserts that as a result of the setting aside of the default judgment, "the issues were determined on the merits in a short time period rather than through a hurried default proceeding against an unrepresented defendant." The FDIC further implies that it did not immediately move to be substituted for MSB because it felt that the interests of MSB and the FDIC were not identical in this proceeding. Finally, the FDIC implies that T&C had questionable motives in taking a default judgment against MSB when all of the principal issues were framed in pleadings filed by represented parties.

■ The abuse of discretion standard governs review of circuit court orders concerning the vacation of default judgments. (*Miura v. Famous Cab Co.* (1982), 107 Ill. App. 3d 803, 438 N.E.2d 530.) The overriding consideration in determining whether the circuit court properly ruled on a motion to vacate a default judgment is whether substantial justice was done between the litigants and whether it is reasonable, under the circumstances, to compel a trial on the merits. *People ex rel. Reid v. Adkins* (1971), 48 Ill. 2d 402, 270 N.E.2d 841.

■ None of the cases cited by T&C hold that the circuit court abused its discretion in vacating a default judgment or that it is improper to vacate a default judgment entered against an original party on motion of a substituted party. Other than the attorney fees and costs which it incurred in obtaining the default judgment here at issue, T&C points to no prejudice which it suffered as a result of the vacation of the default judgment against MSB. We therefore hold that the circuit court's vacation of the default judgment against MSB did in itself not represent a manifest abuse of the court's discretion.

■ The circuit court did, however, abuse its discretion in failing to award T&C the attorney fees and costs which it incurred in obtaining the default judgment against MSB. The historical and practice

notes to the portion of the Code of Civil Procedure governing vacation of default judgments state in part:

"In addition, as the language of *** section [2—1301(e)] suggests, a trial court might well set aside a default judgment and yet impose sanctions such as payment of costs and expenses upon the party who failed to appear or upon his attorney." (Ill. Ann. Stat., ch. 110, par. 2—1301(e), Historical and Practice Notes, at 402 (Smith-Hurd 1983).)

Relying on the above statement, the First District has recognized that a plaintiff may be awarded attorney fees and costs when a failure to plead requires the plaintiff to obtain a default judgment which later is vacated. *Braglia v. Cephus* (1986), 146 Ill. App. 3d 241, 496 N.E.2d 1171.

The FDIC offers no credible explanation for its failure to request that it be substituted for MSB before T&C obtained a default judgment against MSB. Although the FDIC does state in its brief that it felt its and MSB's interests might not be identical, this does not in itself explain why the FDIC delayed requesting that it be substituted for MSB until after T&C obtained a default judgment against MSB. Moreover, the FDIC's counsel acknowledged at oral argument he knew of no reason why the FDIC did not earlier move to be substituted for MSB. If the FDIC had earlier requested that it be substituted as party defendant for MSB and filed an answer on MSB's behalf, it would not have been necessary for T&C to expend the attorney fees and costs which it incurred in obtaining the default judgment. For these reasons, we hold the circuit court abused its discretion in failing to award T&C the reasonable attorney fees and costs which it incurred in obtaining the June 23, 1987, default judgment against MSB.

The circuit court's summary judgment order of September 11, 1987, is reversed; the circuit court's order of July 13, 1987, which vacated the June 23, 1987, default judgment against MSB is affirmed; and the circuit court's order of July 27, 1987, is reversed insofar as it denied T&C an award of the attorney fees and costs which it incurred in obtaining the June 23, 1987, default judgment against MSB. This cause is remanded to the circuit court for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded with directions.

KNECHT and SPITZ, JJ., concur.