CITY NATIONAL BANK OF HOOPESTON, Plaintiff-Appellee and Cross-Appellant, v. DEAN RUSSELL, Defendant-Appellant and Cross-Appellee.

Fourth District   No. 4—92—0910

Argued May 24, 1993.—Opinion filed June 29, 1993.

John P. Wolgamot (argued), of Kurth, Wolgamot & DeArmond, of Danville, for appellant.

Steven M. Helm (argued) and Nancy S. Johnson, both of Dukes, Martin, Helm & Ryan, Ltd., of Danville, for appellee.

JUSTICE COOK delivered the opinion of the court:

Defendant Dean Russell appeals the trial court's summary judgment in favor of plaintiff City National Bank of Hoopeston. Defendant contends the trial court erred in finding consideration for his guaranty and erred in finding no genuine issue of material fact on the affirmative defense of fraud. Plaintiff cross-appeals the trial court's denial of attorney fees. We reverse the order of summary judgment and remand.

G. Neil Sheppard began farming in 1976. When he started his farming business, he received financing from plaintiff bank. Sometime in the late 1970's defendant signed a guaranty for $60,000 to cover plaintiff's loan to Sheppard. At that time Sheppard was defendant's son-in-law. In fall 1986 plaintiff received a bank examiner's report which "criticized" the Sheppard loan. William Penicook, agricultural loan officer at plaintiff bank, stated that because the examiners had "classified" the Sheppard loan, he decided "to help the classification that we would, you know, ask for an increase in the personal guarantee from [defendant]." Sheppard's loan was secured with equipment, crops, and the personal guaranty from defendant. Sheppard's operating loans had not been paid in the past and his machinery had declined in value; therefore, plaintiff wanted additional collateral to cover Sheppard's loan.

On February 27, 1987, Penicook met with Sheppard to discuss concerns about the loan and collateral, and to review Sheppard's loan needs for 1987. Penicook drafted three loans for Sheppard dated February 27: (1) a $30,000 operating loan (a line of credit) for 1987, (2) a $107,670 renewal of an existing loan, and (3) a $1,790 loan for unpaid 1986 operating expenses. The three loans totalled $139,460. Penicook

indicated that at their February 27 meeting he told Sheppard the bank would not make the loan if defendant would not increase the guaranty. Sheppard recalled that Penicook told him "in a professional way that [he] was borderline" and that Penicook would have to get "an okay from [defendant]." This was the first time Sheppard realized that defendant was involved with his financing. On February 27, prior to anyone contacting defendant, the loans were signed making all new funds immediately available to Sheppard. The notes had a term of one year. After his meeting with Sheppard on February 27, Penicook called defendant and told defendant they needed to talk about Sheppard; Penicook did not mention the guaranty in that call.

At his deposition defendant stated he met with Penicook at the bank on April 1, and Penicook told him the bank needed to increase the guaranty on Sheppard's loan to $90,000. Defendant recalled that he asked Penicook how much Sheppard owed and that Penicook answered " 'Around seventy thousand dollars ($70,000.00), he needs twenty for operation for the following year.' " Defendant "believes" he then asked Penicook how much Sheppard's machinery was listed at, and Penicook told defendant "sixty-three thousand dollars ($63,000.00) on machinery and [Sheppard] had twenty-five to maybe thirty coming in for crops that year." Although defendant did not look at the documents referred to by Penicook, he was familiar with Sheppard's farming operation and estimated the machinery might only be worth $40,000. Defendant then figured out his possible liability in his mind by adding the $40,000 collateral from the machinery and the $30,000 estimated income, and told Penicook, " 'Well, if worse [sic] comes to worse [sic]' assuming [Sheppard's] equipment is valued at that, and the money is coming in[,] the worse [sic] I could get hurt for would be about twenty thousand dollars ($20,000.00)[,] and Mr. Penicook agreed with me." Defendant then asked Penicook to keep him informed about Sheppard's finances, read the $90,000 guaranty "somewhat," and signed the guaranty. Defendant claims he understood that "Sheppard would not owe [plaintiff] more than ninety thousand dollars ($90,000)," he could be held liable up to $90,000 if Sheppard failed to make payments, and if he did not sign the guaranty Sheppard "would not be farming." Defendant did not look at Sheppard's financial records and never discussed the guaranty with Sheppard.

Penicook stated at his deposition that when he met with defendant on April 1 he told defendant the bank "needed" to increase the guaranty and asked defendant to increase the limit on the guaranty from $60,000 to $90,000 because "we didn't want to go any farther

[*sic*] without additional collateral." If they discussed the amount of money Sheppard owed, Penicook stated he would have told defendant exactly what Sheppard owed on the three notes signed February 27. There was not much discussion about the necessity for increasing the guaranty because defendant "was willing to sign." Penicook did not recall any discussion about defendant's maximum risk exposure. Defendant did not ask plaintiff "not to call [Sheppard's] loans," "not to sue [Sheppard]," or "not to foreclose" on any of the bank's collateral. Defendant told Penicook that he wanted to be informed annually about how Sheppard was doing, and signed the guaranty. The guaranty provided that defendant would guarantee:

> "the full and prompt payment, when due, whether by acceleration or otherwise, together with interest and all costs, expenses and attorney's fees, of any and all notes, bills, drafts, commercial paper and other obligations or liabilities of the Debtor of every kind (herein collectively called 'Liabilities'), whether signed, accepted, drawn, endorsed or otherwise incurred by the Debtor, that are or shall be owned, held or acquired, whether through discount, overdraft, purchase, direct loan, or as collateral or otherwise by Bank, either for the Debtor or for any holder thereof, provided that the Liability thereon and hereon of the undersigned shall not exceed the principal sum of NINETY THOUSAND AND NO/100—Dollars ($90,000.00) at any one time outstanding.
>
> This Guaranty shall be and remain a continuing and unconditional guarantee for the payment of any and all Liabilities of the Debtor not exceeding in the aggregate the said principal sum at any one time outstanding and shall continue and be in force until all Liabilities of the Debtor guaranteed hereby shall be fully paid."

The next time defendant met with anyone at the bank about Sheppard's loans was one year later in April 1988. Defendant recalled asking Penicook how Sheppard was doing and Penicook responded " 'Oh, he is doing okay' "; that was about the extent of their conversation. Approximately one year later, in April 1989, defendant again discussed Sheppard's loan with Penicook. Defendant asked how Sheppard was doing, Penicook told defendant " 'He is on our watch list,' " and that was the end of their conversation.

In late spring or early summer of 1989 Sheppard and defendant's daughter separated and, in the fall, defendant told Penicook he "would have to withdraw [his] support of [Sheppard's] loans." Defendant recalled that Penicook told him to put "something in writing."

Defendant indicated that he asked Penicook how much Penicook thought defendant would be responsible for on the loans and after checking some documents Penicook told him "$20,000." By late November or early December Sheppard and defendant's daughter had divorced, and defendant called the bank and told Penicook he was getting ready to send the letter. On or about December 18 defendant sent a letter to Penicook and a copy to Sheppard; apparently, the letter mentioned defendant's desire to withdraw his guaranty. A copy of the letter was not included in the record on appeal.

The next contact defendant had with plaintiff bank was at the end of December when Penicook called defendant and asked him to advance $4,000 for Sheppard's fertilizer bill. Defendant asked if it looked like he was "still in the twenty thousand dollar area of this commitment" he would owe the bank, Penicook confirmed that amount, and defendant said " 'well, if I can stand twenty thousand dollars I can surely stand twenty-four' " and he approved the advance for the fertilizer bill. In early January Penicook told defendant the fertilizer bill came to $11,000 and that Penicook had advanced the money to Sheppard on defendant's behalf. Later in January defendant learned that Sheppard planned to sell his farm equipment and quit farming. Defendant heard the sale brought $43,000, less auctioneer fees, which was about what he had estimated as the value of the equipment.

Defendant then met with Penicook on April 1, 1990, and Penicook informed defendant the debt was approximately $113,000. Defendant claims he responded by saying " 'This is way over the limit' " and Penicook said " 'It has always been over the limit. That doesn't mean anything.' " At his deposition, defendant stated this was the first time the bank told him that Sheppard owed more than $90,000. Defendant subsequently received a letter from plaintiff bank describing Sheppard's defaulted loans and requesting payment from defendant as required by the guaranty. About a week later defendant met with Penicook, bank president Byron Hedgecock, and Larry Oyler, the loan officer who originally handled Sheppard's loans. They discussed whether the $43,000 from the machinery sale should be subtracted from the $90,000 guaranty, and Oyler explained "that is not the way it is done." Sheppard subsequently filed bankruptcy.

In October 1990 plaintiff filed a complaint against defendant for the $90,000 guaranty, plus costs and attorney fees. Defendant filed affirmative defenses and a counterclaim; both parties filed motions for summary judgment. After a hearing the trial court granted plaintiff's motion for summary judgment, entered judgment against defendant

for $90,000 plus costs, and denied plaintiff's petition for attorney fees. Defendant filed a timely notice of appeal and plaintiff a timely cross-appeal.

In allowing plaintiff's motion for summary judgment, the trial court ruled there were no genuine issues of material fact. A motion for summary judgment should be granted as a matter of law when the pleadings, depositions, and affidavits reveal no genuine issue as to any material fact. (*Vesey v. Chicago Housing Authority* (1991), 145 Ill. 2d 404, 411, 583 N.E.2d 538, 541; see Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c).) In reviewing the trial court's granting of plaintiff's motion for summary judgment, this court's role is to consider anew the facts and law related to the case to determine whether the trial court was correct. *Gresham v. Kirby* (1992), 229 Ill. App. 3d 952, 955, 595 N.E.2d 201, 203; *Swisher v. Janes* (1992), 239 Ill. App. 3d 786, 790-91, 606 N.E.2d 798, 802.

■ The first issue is whether the trial court erred in finding there was consideration for the guaranty, as a matter of law. A guaranty which is executed contemporaneously with the debt it guarantees is supported by sufficient consideration. (*American National Bank v. Warner* (1984), 127 Ill. App. 3d 203, 207, 468 N.E.2d 184, 187.) However, where the guaranty is executed *after* the guaranteed debt is incurred, new consideration is necessary to support the guaranty. (*First National Bank v. Chapman* (1977), 51 Ill. App. 3d 738, 740, 366 N.E.2d 937, 940; *American National Bank*, 127 Ill. App. 3d at 207, 468 N.E.2d at 187; 1A A. Corbin, Corbin on Contracts §213, at 285-87 (1963).) Forbearance from exercising a right to take legal action against a third party constitutes adequate consideration for the guaranty of a debt obligation of the third party. (*Town & Country Bank v. E. & D. Bancshares, Inc.* (1988), 172 Ill. App. 3d 1066, 1075, 527 N.E.2d 637, 642.) To constitute consideration for a guaranty, an agreement to forbear need not be in express terms or for an exact period of time. (*Town & Country*, 172 Ill. App. 3d at 1075, 527 N.E.2d at 642; *Corn Belt Bank v. Lincoln Savings & Loan Association* (1983), 119 Ill. App. 3d 238, 248-49, 456 N.E.2d 150, 158.) However, the mere fact that the creditor eventually did forbear is not consideration unless the forbearance was pursuant to an agreement between the parties for such forbearance. *First National Bank*, 51 Ill. App. 3d at 742, 366 N.E.2d at 941.

■ Here, the trial court concluded there was consideration; there was an "indicia of forbearance" evidenced by defendant's statement that he understood Sheppard "would not be farming" if defendant did not sign the guaranty. Plaintiff contends that is enough to show con-

sideration in light of Penicook's statement that he told defendant "that we didn't want to go any farther [sic] without additional collateral," and the fact that Sheppard continued to farm in 1987 and 1988 without interference by the bank. Plaintiff views this evidence as particularly convincing given that defendant was an experienced farmer with knowledge of farm financing. To determine whether there was consideration, it must be determined what plaintiff could have done to stop the farm operation. The notes were written for a period of one year; at the end of the year, nothing contained in the notes would have prevented plaintiff from declining to renew them. Plaintiff does not argue that it would have been required to renew the notes, relying instead on its vague argument "there was definitely a suggestion or an inference that Mr. Sheppard would not be allowed to continue his farming operation if defendant did not sign the $90,000.00 'Unconditional Guarantee.' "

An insecurity clause in the "DEFAULT" paragraph on the back of the February 27, 1987, notes issued to Sheppard may have allowed the bank to accelerate the notes if the guaranty had not been signed. (See Ill. Rev. Stat. 1991, ch. 26, par. 1–208.) That paragraph lists several events which constitute default, including if "anything else happens which causes you [the bank] to believe that you will have difficulty collecting the amount I [Sheppard] owe you." Perhaps the bank in good faith could have accelerated the notes by deeming itself insecure, if defendant had not executed the guaranties the bank (and apparently Sheppard) expected defendant to sign. See *Watseka First National Bank v. Ruda* (1990), 135 Ill. 2d 140, 157, 552 N.E.2d 775, 782 ("a creditor acts in good faith when exercising an acceleration clause so long as it acts honestly, irrespective of whether the 'reasonable creditor' would have accelerated under the same circumstances").

As of April 1, 1987, when defendant signed the guaranty, Sheppard had access to all funds from the three loans and none of the loans had yet reached maturity. Penicook admitted that as of February 27, 1987, the loans were fully available to Sheppard, and stated that he decided to increase the personal guaranty from defendant in order to "help with the classification" of Sheppard's loans that the bank had recently received from the bank examiners. Defendant argues the increased guaranty was simply to "shore up" the loans already made to Sheppard. While the bank sought the guaranty to improve its position, there was no evidence presented that the bank could have taken action against Sheppard if the guaranty had not been signed. An agreement to perform one's preexisting contractual obligations does not constitute legally sufficient consideration for a

guaranty agreement. *American National Bank*, 127 Ill. App. 3d at 207, 468 N.E.2d at 187 (no indication Bank in accepting guaranty agreed to forbear collection longer than term of note, which it was already obligated to do).

We find a genuine issue of fact exists as to whether the $90,000 guaranty was supported by sufficient consideration. There was some evidence the Bank could have done nothing if the guaranty had not been signed. The trial court should not have granted summary judgment.

■ It is also an issue whether a material issue of fact exists regarding defendant's affirmative defense. Defendant contends plaintiff made fraudulent misrepresentations to him which he relied upon in signing the $90,000 guaranty. Defendant stated in his deposition that Penicook told him Sheppard owed $70,000 and needed $20,000 for operating; Penicook stated in his deposition that if he told defendant an amount, it would have been the amount of the three loans. Defendant stated that Penicook agreed with his statement that, given the collateral, the worst-case scenario would be defendant owing the bank $20,000; Penicook does not recall discussing the collateral or potential losses with defendant. To prove his claim of fraud, defendant must show (1) plaintiff made a false statement of material fact which plaintiff knew or believed to be false, (2) plaintiff intended to induce defendant to sign the guaranty, (3) defendant signed the guaranty in reliance on the truth of plaintiff's statement, and (4) damage to defendant resulted from justifiable reliance on plaintiff's statement. *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601; *Mt. Zion State Bank & Trust v. Weaver* (1992), 226 Ill. App. 3d 783, 787, 589 N.E.2d 983, 986; see W. Keeton, Prosser & Keeton on Torts §105, at 728 (5th ed. 1984); Restatement (Second) of Torts §537, at 80 (1977).

■ Plaintiff contends there was no fraud because there was no justifiable reliance. Plaintiff argues defendant is not entitled to claim fraud where he had equal access to all relevant information. (See *Central States Joint Board v. Continental Assurance Co.* (1983), 117 Ill. App. 3d 600, 606, 453 N.E.2d 932, 936.) Plaintiff contends defendant could not justifiably rely on Penicook's statement, given that defendant was an experienced farmer familiar with farm loan operations, especially where he had sufficient opportunity to discuss the loans with Sheppard, who lived nearby and was his son-in-law. (See *Luciani v. Bestor* (1982), 106 Ill. App. 3d 878, 884, 436 N.E.2d 251, 256.) Even if defendant relied on Penicook's alleged statement, plaintiff argues such reliance would not be justifiable since defendant could have de-

termined the amount of Sheppard's outstanding loans to the bank by exercising "ordinary prudence." See *Soules*, 79 Ill. 2d at 286, 402 N.E.2d at 601.

Defendant contends his reliance on the statements by Penicook was clearly justified. Even if plaintiff had no duty to provide information to defendant, it did have a duty not to provide false information. A bank has a duty of good faith in dealing with a guarantor (see *Magna Bank v. Jameson* (1992), 237 Ill. App. 3d 614, 617, 604 N.E.2d 541, 543; *Dee v. Bank of Oakbrook Terrace* (1980), 84 Ill. App. 3d 1022, 1025, 406 N.E.2d 195, 198; *McHenry State Bank v. Y & A Trucking, Inc.* (1983), 117 Ill. App. 3d 629, 632-33, 454 N.E.2d 345, 348); therefore, the guarantor is entitled to rely on the representations of fact made by the bank (*Mt. Zion*, 226 Ill. App. 3d at 787, 589 N.E.2d at 986; *Farmer City State Bank v. Guingrich* (1985), 139 Ill. App. 3d 416, 426, 487 N.E.2d 758, 765), especially the representations on how much money the bank has loaned to the person whose debts will be guaranteed. Defendant could have been more cautious and double-checked loan balances with Sheppard, but he must be able to rely on representations of the creditor bank which had a duty to provide him with accurate information regarding Sheppard's loans. A guarantor is a favorite of the law. *Farmers State Bank v. Doering* (1980), 80 Ill. App. 3d 959, 961-62, 400 N.E.2d 705, 707; *Hensler v. Busey Bank* (1992), 231 Ill. App. 3d 920, 926, 596 N.E.2d 1269, 1274.

If the trier of fact accepts defendant's version of the facts, it could find that plaintiff fraudulently induced defendant to sign the guaranty and defendant justifiably relied on Penicook's representations. Accordingly, summary judgment was improper because there are genuine issues of fact regarding the affirmative defense of fraudulent misrepresentation.

■ The last issue raised on appeal is whether the trial court erred in denying plaintiff's request for attorney fees. After a hearing the trial court denied plaintiff's request for attorney fees, strictly construing the ambiguous language of the guaranty against plaintiff. The guaranty provides "the Liability thereon and hereon of the undersigned shall not exceed the principal sum of" $90,000. Payment of notes, interest, attorney fees, and other obligations are "collectively called 'Liabilities'" by the guaranty. By its terms, the guaranty is an "unconditional guarantee for the payment of any and all Liabilities of the Debtor not exceeding in the aggregate the said principal sum." This language limits defendant's total liability on the guaranty (including costs, interest, attorney fees, and principal due) to a total of $90,000. Plaintiff's reliance on *Boatmen's Bank v. Dowell* (1991), 208

Ill. App. 3d 994, 567 N.E.2d 739, is misplaced because the guaranty in that case was not limited as to amount, and expressly included attorney fees as a collectible amount. Defendant correctly points out that guaranty agreements are strictly construed in favor of the guarantor, especially where the guaranty is on a printed form supplied by the creditor. (See *Farmers State Bank*, 80 Ill. App. 3d at 961-62, 400 N.E.2d at 707; *Dee*, 84 Ill. App. 3d at 1024, 406 N.E.2d at 198; *McLean County Bank v. Brokaw* (1988), 119 Ill. 2d 405, 412, 519 N.E.2d 453, 456.) The trial court's decision to award costs but not attorney fees above the $90,000 limit is inconsistent. However, in strictly construing the contract against plaintiff, the trial court correctly denied its request for attorney fees.

Accordingly, we reverse the entry of summary judgment for plaintiff and remand for further proceedings consistent with this opinion.

Reversed and remanded.

STEIGMANN, P.J., and GREEN, J., concur.