INTERNATIONAL SUPPLY COMPANY *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. ROLAND E. CAMPBELL *et al.*, Defendants-Appellees and Cross-Appellants.

Third District    No. 3—08—0221

Opinion filed April 23, 2009.

Joseph B. VanFleet and Brian A. Peterson (argued), both of VanFleet Law Offices, of Peoria, for appellants.

Stephen J. Thomas, of Jackson Thomas LLP, of Peoria, for appellees Roland E. Campbell and Melody L. Campbell.

Jeffrey B. Rock (argued), of Hasselberg, Rock, Bell & Kuppler, of Peoria, for appellee John K. Miller.

JUSTICE CARTER delivered the opinion of the court:

Plaintiffs (International Supply Company and E. Lee Hofmann) filed a two-count complaint against defendants (Roland E. Campbell, Melody L. Campbell, and John K. Miller) for breach of contract. After a bench trial, the trial court ruled in plaintiffs' favor on count I of the complaint (the personal guaranty claim) but stayed the judgment on that claim until certain real property held by plaintiffs as collateral was sold. On count II of the complaint (the loan assistance claim), the trial court ruled in defendants' favor. Both sides appeal. The issues raised on appeal are: (1) whether the trial court erred in ruling in plaintiffs' favor on the personal guaranty claim, (2) whether the trial court erred in staying the judgment on the personal guaranty claim, and (3) whether the trial court erred in ruling in defendants' favor on the loan assistance claim. We reverse the trial court's ruling on the personal guaranty claim, enter judgment in defendants' favor on that claim, vacate the portion of the trial court's order staying judgment on the personal guaranty claim, and affirm the trial court's ruling on the loan assistance claim.

## FACTS

Defendants and a person named Roland Pitcher (the original investors) sought to develop a convention center (the project or the development) in East Peoria, Illinois. For that purpose, the original investors purchased two adjacent tracts of land, referred to as "the convention center property" and "the Powley property."[1] In 2003, plaintiffs—Hofmann and his company, International Supply Company—were brought into the project to help the original investors secure additional financing from a local bank. Hofmann was a business person and a friend of Miller's.

To obtain the additional financing that the original investors sought, plaintiffs borrowed approximately $3.8 million from Central Illinois Bank (the CIB loan) and guaranteed an additional $1.4 million of existing debt (the Powley loan) that was incurred by the original

---

[1]For the purposes of this appeal and for the sake of simplicity, it is not necessary to go into further detail about how title to the property was held or about which of the original investors or their limited liability companies purchased which property.

investors in purchasing the Powley property.[2] Although Hofmann was a primary obligee on the CIB loan, it was the intention of the parties that the cash flow from the development would be sufficient to pay both the CIB loan and the Powley loan (the two loans).

In return for plaintiffs helping to secure the additional financing, the original investors agreed to pay plaintiffs a $500,000 loan assistance fee. To provide security to plaintiffs, the original investors also agreed to place the deeds to the two properties in escrow to be transferred to plaintiffs in the event of a default on either loan. In addition, Pitcher, Miller, and Roland Campbell signed an unconditional personal guaranty, in which they essentially agreed to reimburse or indemnify plaintiffs for any losses resulting from a default on either loan up to $1.3 million ($300,000 as to Pitcher and $500,000 each as to Miller and Roland Campbell). Those promises were given effect through a series of complicated documents that were interrelated. The documents were prepared by plaintiffs' attorney and were signed by the parties on November 7, 2003, at the closing on the CIB loan. The original investors were not represented by an attorney at the closing and there was some testimony at the later trial that Hofmann had told the original investors that they could save a lot of money by having his attorney draft all of the documents.

Although there are numerous documents in the record, the four main documents that the parties have focused on throughout the proceedings in the trial court and on appeal are a personal guaranty, a loan assistance agreement, a unit pledge agreement, and an escrow agreement. The personal guaranty was signed by Pitcher, Miller, and Roland Campbell in their individual capacities. In the text of the personal guaranty, Pitcher, Miller, and Roland Campbell were referred to as the "guarantors." The personal guaranty provided that Pitcher, Miller, and Roland Campbell would: (1) unconditionally guaranty full and prompt payment of all of the indebtedness, liabilities, and obligations of every kind incurred by plaintiffs as a result of a default on either of the two loans; (2) pay all costs and expenses, including

---

[2]The CIB loan actually consisted of a construction loan, a business loan, and a line of credit. Hofmann signed both the construction and the business loans (and the corresponding promissory notes) individually and as a representative of one of the limited liability companies that was involved in the development. International Supply Company was listed in both the construction and the business loans as a guarantor. Miller signed both loans (and the corresponding promissory notes) as a member of another limited liability company that was involved in the development. Roland and Melody Campbell signed the construction loan (and the corresponding promissory notes) in their individual capacities.

reasonable attorney fees, incurred by the lenders in attempting to collect upon plaintiffs' obligations under the two loans; (3) have a total liability under the personal guaranty of up to $1.3 million ($300,000 as to Pitcher and $500,000 each as to Miller and Roland Campbell); and (4) waive all legal and equitable defenses regarding enforcement of the personal guaranty, including the fact that plaintiffs could be deemed to be oversecured with collateral. The personal guaranty provided further that plaintiffs had the right to enforce the personal guaranty without first attempting to liquidate any collateral and that plaintiffs would look to the collateral for any damages exceeding the $1.3 million limit.

The loan assistance agreement was signed by all of the original investors in their individual capacities and by plaintiffs. The written text of the loan assistance agreement referenced the personal guaranty, the unit pledge agreement, and the escrow agreement. Plaintiffs and a certain limited liability company related to the development were referenced in the loan assistance agreement as the "[g]uarantors." The loan assistance agreement provided that: (1) plaintiffs would receive a $500,000 loan assistance fee out of the loan proceeds at the closing on the CIB loan; (2) that fee would be reduced by a certain amount (and that portion returned) if plaintiffs were released early from their obligations under the two loans (*e.g.*, the fee would be reduced by $150,000 if plaintiffs were released within the first year); (3) plaintiffs would receive an additional annual fee of $100,000 if plaintiffs were not released from their obligations under the two loans within three years; (4) plaintiff Hofmann would receive a one-third ownership interest in the Powley property and a certain number of membership units (securities) in the limited liability company that owned the Powley property; (5) as additional collateral security to protect plaintiffs in the event of a default on either of the two loans, the original investors would pledge all of their units of membership in the limited liability companies that were involved in the development by way of the unit pledge agreement and would place in escrow security quitclaim deeds transferring both properties to plaintiffs, which would be given effect and recorded in the event of a default as specified in the escrow agreement; (6) while plaintiffs' obligations on the two loans remained, plaintiff Hofmann would serve as the operating manager of the limited liability companies involved in the development; and (7) if there was no default in either loan and plaintiffs were released from their obligations under the two loans, plaintiffs would cancel the personal guaranty contract and the deeds in escrow, would transfer ownership in the Powley property and in the limited liability companies involved in the project back to the original investors, and

would take the steps necessary to completely remove themselves from the project. As to the loan assistance fee, testimony at the later trial established that plaintiffs were paid the original $500,000 fee in November of 2003 at the closing on the CIB loan.

The unit pledge agreement was signed by all of the original investors, by plaintiffs, and by plaintiff Hofmann as the authorized representative of the limited liability companies involved in the development. The unit pledge agreement provided that: (1) as security for plaintiffs' obligations under the two loans, the original investors would pledge all of their ownership interest in the form of securities or units of membership in the various limited liability companies involved in the project; (2) if there was a default on either of the two loans that was not cured, all of the ownership interest in the limited liability companies (the pledged securities) would be transferred to plaintiffs; (3) if no default occurred and plaintiffs were released from their obligations under the two loans, the ownership interest would be returned to the original investors; (4) in the event of a default, plaintiffs as the pledgees had the rights and remedies available under the Uniform Commercial Code (810 ILCS 5/1—101 *et seq.* (West 2006)), including the right to sell the pledged securities; (5) if the pledged securities were sold as the result of a default, the remaining proceeds would be returned to the original investors after the expenses of the sale were taken out and all of the liabilities were paid in full; and (6) while the loans were pending, the original investors retained the voting rights of the pledged securities, unless the loans were in default, then plaintiffs would have the right to vote the pledged securities.

The escrow agreement was signed by all of the original investors, by plaintiffs, and by plaintiff Hofmann as the authorized representative of the limited liability companies involved in the development. Plaintiffs and a certain limited liability company related to the development were referenced in the escrow agreement as the "guarantors." The escrow agreement provided that: (1) quitclaim deeds, which would either transfer both of the properties to plaintiffs or to the original investors, would be deposited with an escrow agent; (2) if the two loans were paid off in full and plaintiffs were released from their obligations, the escrow agent would deliver the quitclaim deeds to the original investors; (3) if there was a default on either of the two loans, the escrow agent would deliver the deeds to plaintiffs; and (4) either side had a right to object to the delivery of the deeds as previously specified by sending a written objection to the escrow agent within 14 days after notice had been given.

In March of 2005, CIB notified the parties that they were in default on the CIB loan. Plaintiffs subsequently bought out Pitcher's interest

in the project and Pitcher was released from his obligations under the contract. In August of 2005, SPCP Group, LLC (SPCP), took an assignment of the CIB loan from CIB. SPCP later filed suit in federal court against plaintiffs and defendants on the CIB loan. Plaintiffs settled the suit with SPCP for slightly less than $3.8 million (including SPCP's attorney fees) and took an assignment of the loan documents. Almost immediately thereafter, plaintiffs notified the escrow agent that a default had occurred and instructed the escrow agent to transfer the deeds to both the convention center property and the Powley property into plaintiffs' names. In the transfer, plaintiffs took exclusive title, control, and possession of the collateral (the two properties). Through a later court proceeding, plaintiffs had defendants forcibly evicted from the two properties.

In April of 2006, plaintiffs filed the instant action for breach of contract. In count I of the complaint, plaintiffs sought to enforce the personal guaranty against defendants Miller and Roland Campbell. In count II, plaintiffs alleged a breach of the loan assistance agreement against all three defendants. Defendants filed motions to dismiss the complaint alleging, among other things, that their obligation under the personal guaranty had been discharged, satisfied, or extinguished. The motions to dismiss were denied. Defendants denied liability and asserted a counterclaim and various affirmative defenses. Most notably, defendants alleged that they had been fraudulently induced to enter into the contract by plaintiff Hofmann's promise that he would include a cure provision in the contract, a promise that defendants alleged that Hofmann never intended to keep.

At the bench trial, in addition to the evidence described above, testimony was presented regarding defendants' claim of fraudulent inducement. Miller and Roland Campbell testified that they had discussed a cure period with Hofmann at different times leading up to the closing and that Hofmann had told them that he would include such a provision in the contract. Miller and Roland Campbell testified further that they noticed that the cure provision was not included in the contract at the closing, that Hofmann refused to have the parties pencil it into the contract, and that Hofmann told them that he would have his attorney add the provision through a subsequent document. Neither Miller nor Roland Campbell, however, could provide any specific information regarding the terms of such a provision. Hofmann himself denied that such a promise was made or, at the very least, claimed not to remember making such a promise. A representative of CIB, who attended the closing on the CIB loan, testified that there was some discussion of a cure period at the closing and of the possibility of adding such a provision after the closing. The trial court found Hofmann's testimony on this issue not to be credible.

After hearing all of the evidence, the trial court rejected defendants' counterclaim and affirmative defenses and ruled in plaintiffs' favor on the personal guaranty claim (count I of the complaint). The trial court stayed the judgment on that claim, however, until the collateral held by plaintiffs (the real property) was sold. Prior appraisals conducted for plaintiffs had indicated that the value of the two properties was about $9.1 million in 2005 ($3.6 million for the convention center property and $5.5 million for the Powley property) and about $10.3 million in 2006 ($4.8 million for the convention center property and $5.5 million for the Powley property). As to the loan assistance claim (count II of the complaint), the trial court ruled in defendants' favor. This appeal followed.

## ANALYSIS

In an attempt to resolve the issues raised in this appeal in a logical manner, we will first determine whether the trial court erred when it ruled in plaintiffs' favor on the personal guaranty claim (count I of the complaint), an issue raised by defendants on cross-appeal. Defendants argue that the trial court's ruling on the personal guaranty claim was erroneous. In support of that argument, defendants assert first that the personal guaranty is voidable and should not be enforced because they were fraudulently induced to enter into the personal guaranty by Hofmann's promise to include a cure period in the transaction, a promise that Hofmann never intended to keep (raised in the trial court in a counterclaim alleging fraud and in an affirmative defense alleging equitable estoppel based on fraud). Next, defendants assert that they have no obligation under the personal guaranty because the debt has been extinguished and because plaintiffs have not suffered any losses or damages as a result of the default. Defendants note that plaintiffs ultimately received a windfall in this transaction in that plaintiffs took title to real property worth $10 million after discharging only about $3.8 million in debt.[3]

Plaintiffs argue that the trial court's entry of judgment in plaintiffs' favor on the personal guaranty claim is proper and should be affirmed. Plaintiffs assert first that defendants' claim of fraud is barred by the Credit Agreements Act, which precludes a debtor from maintaining an action relating to an oral credit agreement. See 815 ILCS 160/2 (West 2006). Second, plaintiffs assert that defendants'

---

[3]Defendant Miller is represented by a different attorney than defendants Roland and Melody Campbell. The arguments of all three defendants are set forth in this opinion collectively, unless otherwise indicated. As to this first issue, only defendants Miller and Roland Campbell are involved. Defendant Melody Campbell did not sign the personal guaranty.

fraud claim is barred by the Frauds Act (also known as the statute of frauds), which precludes a party from enforcing an oral promise (in this case, the promise to allow for a two-year cure period) that is not to be performed within one year unless the promise is in writing and signed by the party to be bound. See 740 ILCS 80/1 (West 2006). Third, plaintiffs assert that defendants have failed to establish the elements of fraud and of equitable estoppel. Most notably, plaintiffs suggest that defendants' allegation of fraud is based upon a promise of future conduct (the promise to add a cure period to the contract through a later written document), which is not a statement of material fact that may give rise to a fraud action under Illinois law. Fourth, plaintiffs assert that the underlying debt has not been extinguished and that plaintiffs have clearly suffered losses as a result of the default. Plaintiffs point out that they were sued in federal court by SPCP and that as part of the settlement of that case, plaintiffs took an assignment of the CIB loan documents.

Defendants respond that the Credit Agreements Act does not apply in this case because plaintiffs are not in the business of lending money. See 815 ILCS 160/1 (West 2006). Defendants respond further that their fraud claim is not barred by the Frauds Act since the oral promise of a cure period had the possibility of being performed within one year if a default had occurred within that time period. In addition, defendants point out that the Frauds Act cannot be used to accomplish a fraud, especially in a case such as this one, where no written document exists because the fraudulent party took on the responsibility of preparing a written document and then failed or refused to do so. Defendants also dispute the assertion that they have failed to prove the elements of fraud and of equitable estoppel. Defendants note that a promise of future conduct may give rise to a fraud claim when that promise is the device or scheme by which the fraud is accomplished. And finally, defendants contend that there is no dispute in this case that the CIB loan was paid off when the federal lawsuit was settled.

The parties suggest that a *de novo* standard of review is appropriate for this issue because it involves the interpretation of a contract, a question of law. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129, 835 N.E.2d 801, 821 (2005). Although we agree with that assessment, we believe that the issue presented here involves more than just the interpretation of a contract. The trial court's ruling in this case was made following a bench trial and was based in part upon certain factual findings made by the trial court. To the extent that those factual findings are relevant to our determination of this issue, they must be given deference on appeal. Thus, we will not reverse the trial court's factual findings unless they are

against the manifest weight of the evidence. See *First Baptist Church v. Toll Highway Authority*, 301 Ill. App. 3d 533, 542, 703 N.E.2d 978, 984 (1998) (trial court's ruling made after bench trial will not be reversed on appeal unless that ruling is against the manifest weight of the evidence); *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72, 866 N.E.2d 85, 96 (2006) (trial court's determination of whether a material breach of a contract has been committed is a finding of fact, which will not be reversed on appeal unless it is against the manifest weight of the evidence). However, to the extent that we are called upon to interpret the contract between the parties, a question of law, we will apply a *de novo* standard of review, as the parties have suggested. See *Avery*, 216 Ill. 2d at 129, 835 N.E.2d at 821.

■ Before we address the specific assertions of the parties, we must address certain preliminary matters. First, we must determine whether the four main documents involved in this case should be viewed collectively as one contract, as suggested by defendants, or whether each one of the four main documents should be viewed as a separate and independent contract, as suggested by plaintiffs. The well-settled rule of contract law is that when two or more written documents are executed by the same contracting parties as part of the same transaction, those documents will be read and considered together as one contract encompassing the entire agreement between the parties, unless there is evidence that the parties intended for the documents to be read separately. *Illinois Match Co. v. Chicago, Rock Island & Pacific Ry. Co.*, 250 Ill. 396, 400, 95 N.E. 492, 493 (1911); *Community State Bank of Galva v. Hartford Insurance Co.*, 187 Ill. App. 3d 110, 114, 542 N.E.2d 1317, 1320 (1989); *First National Bank of Geneva v. Lively*, 211 Ill. App. 3d 1, 5, 569 N.E.2d 1247, 1250 (1991).

Applying that rule of law to the facts of the present case, it is clear that the four main documents must be construed together as a single contract. See *Illinois Match Co.*, 250 Ill. at 400, 95 N.E. at 493; *Community State Bank of Galva*, 187 Ill. App. 3d at 114, 542 N.E.2d at 1320; *First National Bank of Geneva*, 211 Ill. App. 3d at 5, 569 N.E.2d at 1250. The four main documents were entered into at the same time by the same contracting parties as part of the same transaction. Contrary to plaintiffs' assertion, there is simply no indication that the parties intended the documents to be read separately. The documents were interrelated with some of the documents referring to the other documents and some of the documents describing portions or all of the entire transaction.

■ Next, we must comment upon the nature of the promise that the parties have labeled a "personal guaranty." A guaranty contract is an agreement between a guarantor and a creditor wherein the guaran-

tor agrees to be secondarily liable to the creditor for a debt or obligation owed to the creditor by a third party (the debtor). See *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 620, 863 N.E.2d 743, 758 (2007); *JP Morgan Chase Bank, N.A. v. Earth Foods, Inc.*, 386 Ill. App. 3d 316, 321, 898 N.E.2d 718, 723 (2008); *Town & Country Bank of Quincy v. E. & D. Bancshares, Inc.*, 172 Ill. App. 3d 1066, 1073, 527 N.E.2d 637, 641 (1988). A guarantor's secondary liability is triggered by a default of the debtor on the obligation the debtor owes to the creditor. *JP Morgan Chase Bank, N.A.*, 386 Ill. App. 3d at 321, 898 N.E.2d at 723.

■ It is obvious from the above description of a guaranty contract that the personal guaranty provided in the present case by defendants to plaintiffs was not a normal guaranty as defined under Illinois law. See *Fuller Family Holdings, LLC*, 371 Ill. App. 3d at 620, 863 N.E.2d at 758; *JP Morgan Chase Bank, N.A.*, 386 Ill. App. 3d at 321, 898 N.E.2d at 723; *Town & Country Bank of Quincy*, 172 Ill. App. 3d at 1073, 527 N.E.2d at 641. This was not a situation where one party made a promise to a creditor to be secondarily liable for the debt of another party. Plaintiffs and some of the defendants individually signed the promissory note to CIB and, thus, incurred primary liability on the note to CIB, not secondary liability. In addition, defendants' alleged promise of guaranty was made to plaintiffs, not to the creditor, CIB. The trial court recognized as much when it commented that the instant "personal guaranty" was not consistent with the common form of a guaranty. The trial court noted, and we agree, that the contract, comprised of the four main documents, is not consistent as to which party is the "guarantor." Furthermore, the labels that have been placed upon the document or the promise are not dispositive of this matter. Labeling a document or a promise a "guaranty" does not automatically make it a guaranty under the law and does not conclusively establish the obligations of the parties involved. See *Phillips v. O'Connell*, 326 Ill. App. 15, 24, 61 N.E.2d 59, 63-64 (1945). Rather, the obligations of the parties must be determined from the terms of the contract and the circumstances under which the contract was made. *Phillips*, 326 Ill. App. at 24, 61 N.E.2d at 63-64.

Under the circumstances of the present case, we cannot find that the promise in question was a guaranty or that it should be construed as separate from the other agreements or interpreted under guaranty principles. What we are left with is a confusing and jumbled agreement containing a promise by defendants to essentially reimburse or indemnify plaintiffs for any losses or liabilities incurred by plaintiffs as a result of a default on either of the two loans. Thus, we are compelled to construe that obligation as part of all of the obligations

read together under contract principles and not as an obligation separate and apart from the other agreements. However, we will continue to refer to that promise as "the personal guaranty" throughout the remainder of our decision here to avoid adding further confusion to this case.

Having resolved the preliminary matters, we now turn to the specific assertions of defendants. We need only address defendants' assertions that their obligation under the personal guaranty claim was extinguished and that plaintiffs suffered no losses or damages as a result of the default, since those assertions are dispositive of this issue. It is well established that to prevail on a breach of contract claim, a plaintiff must plead and prove that: (1) a contract exists, (2) plaintiff performed his obligations under the contract, (3) defendant breached the contract, and (4) plaintiff sustained damages as a result of defendant's breach. *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1014, 876 N.E.2d 218, 226 (2007). It is equally well settled under contract law that one who is owed a contractual obligation is entitled to only one full satisfaction or one full performance of that obligation. *Emerson v. LaSalle National Bank*, 40 Ill. App. 3d 794, 798-99, 352 N.E.2d 45, 49 (1976). In addition, there is a long-standing principle in the law of contract that if a person who is owed an obligation under a contract accepts in full satisfaction of that obligation, a performance by the obligor that is different from what is due, the obligation under the contract is discharged. Restatement (Second) of Contracts §278, Comment *a*, at 373-74 (1981). See also *Pinnel's Case*, 77 Eng. Rep. 237 (1602) (stated in *dicta* that a debtor's giving of something other than money, such as a horse, hawk, or robe, to pay off a debt in full may constitute full satisfaction of that debt if the creditor accepts it as such, because the substituted items may be more beneficial to the creditor than the money owed).

■ In the present case, after the default occurred, plaintiffs took title to and possession of the two properties held as collateral, as plaintiffs had a contractual right to do. Plaintiffs could have held onto and reasonably maintained the collateral while they pursued recovery against defendants under the personal guaranty. See Restatement of Restitution §80, Comment *d* (1937). Those contractual rights as to the collateral, however, are limited by equitable principles, which do not allow a creditor to forever sit on collateral, seek alternative relief, and have the use of the collateral, which the debtor expected would satisfy the obligation, to the debtor's hardship. See *Heller v. Lee*, 130 Ill. App. 3d 701, 703, 474 N.E.2d 856, 858 (1985); see also Restatement (Third) of Suretyship & Guaranty §51(2)(b) (1996) (a creditor may be required

to liquidate collateral to satisfy a debt when to do otherwise would cause undue hardship). Or, plaintiffs could have sold the two properties held as collateral in an effort to satisfy defendants' obligation, at least in part. Plaintiffs, however, took neither of those two courses of action. Instead, plaintiffs took full ownership and control of the two properties and began to develop those properties for their own investment purposes, to the exclusion and detriment of defendants. Plaintiffs exercised dominion and control over the two properties and never really actively attempted to sell the properties. Yet, during his testimony at trial, plaintiff Hofmann admitted that if the properties had been sold, there would have been more than enough money generated from that sale to cover any loans that were outstanding. Hofmann further admitted that plaintiffs were developing a portion of the properties into a subdivision. Although the extent of that development has not been specifically set forth in the record, it is clear that the second appraisal that was done placed a higher value on one of the two properties, as compared to the previous appraisal, because of the work that had been done. By taking those actions, plaintiffs essentially accepted the transfer of the two properties as substitute performance in full satisfaction of defendants' obligation under the personal guaranty. Plaintiffs can only collect one full satisfaction of that obligation. See *Emerson*, 40 Ill. App. 3d at 798-99, 352 N.E.2d at 49. Defendants' obligation under the contracts read together and including the personal guaranty, therefore, was discharged and satisfied, and the trial court erred in entering judgment for plaintiffs on the personal guaranty claim. See Restatement (Second) of Contracts §278, Comment *a* (1981). There is nothing in the contract that would entitle plaintiffs to accept the benefit of a substituted performance, refuse to discharge the personal guaranty, and still insist on further payment, while holding and controlling the property. See *Mathias v. Jacobs*, 238 F. Supp. 2d 556, 570-72 (S.D.N.Y. 2002); *Combs v. Gray*, 769 S.W.2d 806, 809-11 (Mo. App. 1989). See also Restatement of Restitution §80, Comment *a*, at 247 (1937) ("[t]he right to restitution which arises from the fact that a person performs a duty owed by himself and another which, as between the two, is primarily owed by the other, is limited to reimbursement for the net outlay reasonably expended by the payor"). Thus, at the time of trial, there were no damages due or proven in favor of plaintiffs. The conclusion we reach on this issue is consistent not only with the actions taken by plaintiffs after the default occurred but also with the actions taken by defendants. Defendants have not sought to obtain any excess from a sale of the two properties. Rather, defendants merely ask to be discharged from any further obligation under the personal guaranty.

Based upon our conclusion that judgment on the personal guaranty claim should not have been entered in plaintiffs' favor, we need not address plaintiffs' argument that the trial court erred in staying judgment on that claim until the two properties were sold, because the issue is now moot. Instead, we turn to the remaining issue raised on appeal: whether the trial court erred in entering judgment in defendants' favor on the loan assistance claim (count II of the complaint). Plaintiffs argue that the trial court's ruling was erroneous and assert that they are entitled to a new payment of the loan assistance fee because the payment that they received was turned over to SPCP in the federal lawsuit as part of the funds necessary to pay off the underlying debt. Plaintiffs also assert that they are entitled to two additional annual payments of $100,000 each as referenced in the loan assistance agreement because defendants failed to remove plaintiffs from their obligations under the loans within a three-year time period.

Defendants argue that the trial court's ruling on the loan assistance claim is proper and should be affirmed. Defendants assert that a $500,000 fee was paid to plaintiffs at the closing on the CIB loan and that plaintiffs are not entitled to any additional payments. Defendants further assert that the contract is ambiguous as to the effect that a default on the underlying debt would have on the obligations provided for in the loan assistance agreement and that the ambiguity must be construed against plaintiffs since plaintiffs' attorney drafted the documents.

We will apply the same mixed standard of review to this issue that we applied to the first issue. The rules of contract interpretation are well established. The primary goal of contract interpretation is to give effect to the intent of the parties. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556, 866 N.E.2d 149, 153 (2007). If the contract language is clear and unambiguous, it should be given its plain and ordinary meaning and enforced as written. *Virginia Surety Co.*, 224 Ill. 2d at 556, 866 N.E.2d at 153; *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748, 551 N.E.2d 340, 342 (1990). However, if the contract language is ambiguous, the meaning of the contract language must be ascertained through a consideration of extrinsic evidence. See *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334, 830 N.E.2d 760, 769 (2005). Any ambiguity that exists must be resolved against the drafter of the contract documents. *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 493, 505 N.E.2d 314, 319 (1987).

■ Having reviewed the four main documents in the present case, we agree with defendants that the contract between the parties is ambiguous as to the effect that a default would have on the obliga-

tions set forth in the loan assistance agreement. The only thing that is clear about this matter is that plaintiffs were paid the required $500,000 loan assistance fee at the closing on the CIB loan on November 7, 2003. The ambiguity that exists must be resolved against plaintiffs, since plaintiffs' attorney drafted all of the documents in question. See *Duldulao*, 115 Ill. 2d at 493, 505 N.E.2d at 319. We find, therefore, that plaintiffs have failed to establish that they are entitled to any further payments under the loan assistance agreement. The trial court properly ruled in defendants' favor on the loan assistance claim.

For the foregoing reasons, we reverse the trial court's order entering judgment in plaintiffs' favor on the personal guaranty claim (count I of the complaint). Instead, pursuant to the powers of the reviewing court as set forth in Supreme Court Rule 366 (155 Ill. 2d R. 366), we enter judgment in favor of defendants Roland E. Campbell and John K. Miller on that claim. In addition, we vacate that portion of the trial court's order staying the judgment on the personal guaranty claim, since based upon our ruling here, that portion of the trial court's order no longer applies. And finally, we affirm the trial court's order entering judgment in defendants' favor on the loan assistance claim (count II of the complaint).

Affirmed in part and reversed in part; cause vacated in part.

O'BRIEN, P.J., and LYTTON, J., concur.