2024 IL App (1st) 230551
No. 1-23-0551
Opinion filed June 21, 2024

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| FIRST AMERICAN BANK, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County. |
| | ) | |
| POPLAR CREEK, LLC; ESTATE OF GEORGE A. | ) | |
| MOSER; DOUGLAS C. ALTENBERGER; GEORGE M. | ) | No. 17 CH 14974 |
| MOSER; MARTIN WALSH; STONEGATE | ) | |
| CONFERENCE AND BANQUET CENTRE, LLC; | ) | |
| UNKNOWN OWNERS; AND NONRECORD | ) | Honorable |
| CLAIMANTS, | ) | Patrick J. Heneghan, |
| | ) | Judge, presiding. |
| Defendants, | ) | |
| | ) | |
| (Estate of George A. Moser, Douglas C. Altenberger, and | ) | |
| George M. Moser, Defendants-Appellants). | ) | |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Johnson and Justice C.A. Walker concurred in the judgment and
opinion.

**OPINION**

¶ 1    In supplemental collection proceedings, First American Bank (First American) recovered

a portion of a judgment against Poplar Creek, LLC (Poplar Creek), through a settlement with

a guarantor. The remaining guarantors then sought a finding under section 12-183 of the Code

of Civil Procedure (735 ILCS 5/12-183 (West 2022)) that the judgment had been satisfied when Poplar Creek assigned to First American as additional collateral a security interest in a tax increment financing (TIF) note from the Village of Hoffman Estates. The guarantors argued that (i) First American should have first applied payments it received from other sources to the judgment and (ii) First American's retention of a TIF note satisfied the judgment. The trial court denied the petition.

¶ 2     We affirm. The trial court did not err in finding that (i) First American was not required to sell the TIF note under the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 *et seq.* (West 2022)) or principles of equity, (ii) retaining the TIF note did not satisfy the judgment, and (iii) First American had discretion in applying payments and credits it received on the debt.

¶ 3                                        Background

¶ 4     First American made a commercial property loan to Poplar Creek in 2004, secured by a mortgage lien and assignment of rents and the limited guarantees of Poplar Creek's managers—George A. Moser, Douglas C. Altenberger, George M. Moser, and Martin M. Walsh, who is not a party to this appeal. (George A. Moser's estate was substituted as a party.) The guarantors' obligations were limited "to the amount of ten percent (10.00%) of the outstanding Obligations" plus interest, expenses including reasonable attorney's fees, and "all amounts reasonably necessary to protect, preserve and maintain the Premises (as defined in the Loan Agreement), including without limitation amounts paid to other lien holders or governmental entities." The guaranties stated that "[a]ny amounts received by the Bank from whatsoever source on account of the Obligations may be applied by it toward the payment of such of the Obligations, and in such order of application, as the Bank may from time to time elect."

¶ 5    In an amendment, Poplar Creek assigned a security interest to First American as additional collateral in the form of a TIF note from the Village of Hoffman Estates. A pledge and security agreement (TIF Pledge) memorialized the assignment. The TIF note had a principal amount of up to $3,584,840 and provided the holder with annual interest payments of several hundred thousand dollars from a portion of collected tax revenue. The TIF note provided:

> "The note, together with the interest thereon, is a limited obligation of the Village, payable solely and only from the collection of the Pledged Taxes and the amounts on deposit in and pledged to the various funds and accounts as provided herein. No holder of the note shall have the right to compel the exercise of any taxing power of the Village for payment of principal thereof or interest thereon. The note does not constitute an indebtedness of the Village or a loan of credit thereof within the meaning of any statutory or constitutional provision."

¶ 6    The TIF Pledge stated, "The bank shall not be obligated to make any sale of the TIF note if it shall determine not to do so, regardless of the fact that notice of sale may have been given."

¶ 7    Poplar Creek defaulted when the loan matured on September 1, 2017. First American presented the TIF note to the Village and became its holder and registered owner. The Village made four interest payments on the TIF note to First American between July 2019 and November 2021, totaling $1,275,222.72, which First American applied toward the loan balance, as required by the terms of the note. The TIF note expired on December 31, 2021, with the Village's expected final payment of about $386,000 coming in 2022.

¶ 8    In November 2017, First American sued Poplar Creek, the guarantors, and others to foreclose the mortgage. Poplar Creek filed for bankruptcy, staying the foreclosure case against it. First American filed a proof of claim for nearly $6.8 million in the bankruptcy case,

representing amounts due on the loan as of May 15, 2018. The bankruptcy court approved the claim and ordered a sale of the real property securing the loan. First American submitted a credit bid of $2.1 million and applied it to the debt.

¶ 9    With the case against Poplar Creek stayed, First American moved for partial summary judgment against the guarantors. After briefing, the trial court entered a written order granting First American's motion against each guarantor for $905,061.49 (which included 10% of the outstanding principal or $658,700.21 plus $246,361.28 in real estate taxes First American paid) as well as $1,000,832.44 in accrued interest, attorney's fees, and costs. The trial court later clarified that the judgment amounts for the accrued interest involved a single satisfaction among the judgment debtors. The guarantors appealed, and this court affirmed. *First American Bank v. Poplar Creek, LLC*, 2020 IL App (1st) 192450.

¶ 10    In supplementary proceedings, First American obtained $4,280,222.82 of the nearly $6.8 million owed on the loan, which included Walsh's $905,000 settlement payment, the $2.1 million credit bid for the property, and the $1,275,222.72 in TIF note interest payments.

¶ 11    The three remaining guarantors filed a petition under section 12-183 of the Code of Civil Procedure (735 ILCS 5/12-183 (West 2022)) for an order that the judgment had been satisfied. The guarantors contended that (i) under the UCC and principles of equity, First American had to either sell the TIF note or accept it as complete satisfaction of the judgment and (ii) First American should have applied money it received from other sources to the judgment.

¶ 12    After briefing and discovery, the parties waived an evidentiary hearing and submitted a joint statement of undisputed facts. The parties also submitted documentary exhibits, affidavits, and deposition transcripts, including from their expert witnesses, who testified about the value of the TIF note. First American's expert, Mary O'Connor, averred the TIF note was

a nonrecourse note because the Village had no obligation to pay principal or accrued interest at the end of the agreement and opined that "there is no liquid public market for a contract of this nature." The guarantors' expert, Howard Samuels, acknowledged the Village had no obligation to pay principal under the TIF note but opined First American could have sold it because "there's a market for anything and everything." Samuels admitted that he never tested the TIF note's market value, nor did he provide an amount the bank could have obtained.

¶ 13    A Village employee who managed the TIF note payments testified at a deposition that the Village had never paid principal on the note because of insufficient tax revenues and the TIF note did not contain a guarantee or obligation of payment, as the Village pays principal and interest only if sufficient incremental tax revenues exist.

¶ 14    The trial court entered a written order denying the petition for satisfaction of judgment. The court found that (i) First American had discretion under the guaranties to allocate payments and credits as it saw fit, (ii) Illinois law did not require First American to apply the payments and credits it received to the judgment against the guarantors rather than to the principal debt, and (iii) double recovery was not an issue because the loan amount exceeded the amount First American had recovered.

¶ 15    The trial court also rejected the guarantors' argument that the UCC required First American to sell the TIF note on the grounds that (i) the guarantors relied on permissive, not mandatory, provisions of the UCC, (ii) the TIF Pledge gave First American discretion not to sell the TIF note, and (iii) First American "acted in a commercially reasonable manner in retaining the TIF Note and receiving the few remaining annual interest-only payments due under the Note."

¶ 16    In addressing commercial reasonableness, the court listed the "known challenges and obstacles" First American faced in trying to sell the TIF note, including "(1) it was an

underperforming TIF Note; (2) no principal sum had ever been paid on the Note because of insufficient tax revenue; (3) all of the interest that had accrued on the Note had not been paid because of insufficient tax revenue; (4) the tax revenue to pay interest or principal was deficient and stagnant; (5) the Village was only conditionally responsible for payments on the Note (only if sufficient tax revenues existed); and (6) the TIF Note had only a limited remaining life and was set to expire as of December 31, 2021."

¶ 17    The court concluded equitable principles did not support the guarantors' argument that retaining the TIF note satisfied the judgment because (i) First American "exercised its rights under the TIF Pledge" to become the holder and registered owner of the note, (ii) the bankruptcy court acknowledged First American accepted the TIF note " '[i]n partial satisfaction' " of the judgment, and (iii) the guarantors' "expert did not support their equitable claim," having confirmed the TIF note had limited value.

¶ 18                                    Analysis

¶ 19    A proceeding under section 12-183 determines whether all money due has been paid and a judgment has been satisfied. *Work Zone Safety, Inc. v. Crest Hill Land Development, L.L.C.*, 2015 IL App (1st) 140088, ¶ 15. Once a judgment has been paid in full, the defendant becomes statutorily entitled to receive a release. *Otto Baum Co. v. Süd Family Ltd. Partnership*, 2020 IL App (3d) 190054, ¶ 21.

¶ 20    Generally, a reviewing court will reverse a release of judgment only where the trial court abused its discretion. *Id.* Abuse of discretion occurs when no reasonable person would take the view adopted by the court. *U.S. Bank National Ass'n v. Miller*, 2020 IL App (1st) 191029, ¶ 33. An error of law can constitute an abuse of discretion. *US Bank, National Ass'n v. Avdic*,

2014 IL App (1st) 121759, ¶ 18. We review *de novo* issues of statutory construction, which are questions of law. *Board of Education of Chicago v. Moore*, 2021 IL 125785, ¶ 18.

¶ 21                                    Language of the TIF Pledge

¶ 22       The guarantors argue the trial court erred in finding that the TIF Pledge exempted First American from having to sell the TIF note.

¶ 23       Contract construction seeks to give effect to the parties' intent. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33 (2007) (intent is not ascertained from detached portions of contract or clause or provision but emerges from plain and ordinary meaning of contract's language). Moreover, courts interpret contracts "as a whole, viewing each part in light of the others." *Id.* at 233.

¶ 24       The guarantors contend the trial court erred in its interpretation of the TIF Pledge provision that First American "shall not be obligated to make any sale of the TIF Note if it shall determine not to do so, regardless of the fact that notice of sale may have been given." According to the guarantors, First American cannot hold the note indefinitely without selling it, but should First American give notice of a sale, it has no obligation to proceed with it. We disagree.

¶ 25       Under the guise of construing the provision, the guarantors twist unambiguous plain language that gives First American unfettered discretion to retain the TIF note. Unless contrary to public policy, which the guarantors do not argue, the provision must be enforced. See *Village of Oak Park v. Schwerdtner*, 288 Ill. App. 3d 716, 719 (1997) (courts will not enforce contract contrary to public policy as reflected in constitution, statutes, or judicial decisions).

¶ 26                                           The UCC

¶ 27       The guarantors argue that, under the UCC, a creditor that takes possession of collateral *must* either (i) accept it in satisfaction of the judgment or (ii) sell it. They assert that First

American did neither by retaining the TIF note while still trying to collect from the guarantors and, thus, the judgment against them has been satisfied.

¶ 28    To arrive at their desired result, the guarantors construe the relevant UCC provisions regarding accepting collateral as mandatory and apply the doctrine of *in pari materia*, which views sections of a statute as a whole and gives them "harmonious effect." *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 24. According to the guarantors, the UCC sections only have a "harmonious effect" if a creditor must choose between retaining the collateral in satisfaction of the loan or selling it.

¶ 29    Section 9-609 of the UCC provides, "[a]fter default, a secured party *** *may* take possession of the collateral." (Emphasis added.) 810 ILCS 5/9-609(a)(1) (West 2022). Further, under section 9-610(a), "[a]fter default, a secured party *may* sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." (Emphasis added.) *Id.* § 9-610(a). Section 9-620(a) specifies that "a secured party *may* accept collateral in full or partial satisfaction of the obligation." (Emphasis added.) *Id.* § 9-620(a). Once a secured party accepts collateral in full or partial satisfaction of an obligation, then section 9-622(a) transfers to the secured party all of the debtor's rights in the collateral and discharges (i) the obligation to the extent consented to by the debtor, (ii) the security interest, and (iii) other subordinate interest. *Id.* § 9-622(a).

¶ 30    The guarantors then point to comments 2 and 9 of section 9-620. After taking possession, comment 2 says that section 9-620 "deal[s] with strict foreclosure, a procedure by which the secured party acquires the debtor's interest in the collateral without the need for a sale or other disposition under Section 9-610." 810 ILCS Ann. 5/9-620, Uniform Commercial Code Comment 2 (Smith-Hurd 2022). Comment 9 says, "legislatures should conform those laws so

that they mesh well with this section and Section 9-610, and courts should construe those laws and this section harmoniously." *Id.* cmt. 9. The guarantors assert that, because the comments to section 9-620's acceptance provisions mention section 9-610's sale provision, the sections together require a creditor to sell the collateral or retain it in complete satisfaction of the debt.

¶ 31      We reject the guarantors' specious reading of the UCC. Sections 9-610 and 9-620, specifically comment 5 to section 9-620, state the contrary of the guarantors' position: "A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section." *Id.* cmt. 5. This defeats the guarantors' contention that accepting collateral satisfies a debt.

¶ 32      Moreover, had the legislature intended to impose a mandatory obligation on a creditor regarding collateral, it could have done so as in section 9-620, which mandates the disposition of consumer goods under certain circumstances. See 810 ILCS 5/9-620(e) (West 2022). The legislature imposed no similar obligations on creditors regarding other types of collateral.

¶ 33      As for interpreting the word "may" in the article 9 UCC provisions as permissive, the guarantors assert that case law supports a finding that, although a creditor "may" choose to sell the collateral or retain it in satisfaction of the debt, it "must" choose between one of those two options.

¶ 34      But the guarantors bypass that "may" will be construed to mean "shall" when the rights of the public or third persons depend on exercising the duty to which it refers. *Figures v. Swank*, 128 Ill. App. 2d 211, 216 (1970). The UCC statutory provisions here do not involve public or third parties' rights, distinguishing the cases cited by the guarantors. For instance, in *Bourke v.*

*Grey Wolf Drilling Co.*, 2013 WY 93, ¶ 18, 305 P.3d 1164 (Wyo. 2013), the Wyoming Supreme Court held that a statute stating that actions against nonresidents and foreign corporations "may be brought" where the cause of action arose or where the plaintiff resides was mandatory in the sense that a nonresident or foreign corporation must choose one of those options. (Internal quotation marks omitted.) The article 9 provisions on which the guarantors rely do not have similar language.

¶ 35　　　　Moreover, the guarantors misconstrue section 9-620 to conclude that retaining collateral means a creditor has "accepted" it in complete satisfaction of the debt obligation. Under that section, acceptance requires more than retaining collateral to trigger the total or partial satisfaction provision. As noted in comment 5 to section 9-620, "[t]o ensure that the debtor cannot unilaterally cause an acceptance of collateral," "acceptance does not occur unless, in addition, the secured party consents to the acceptance in an authenticated record or sends to the debtor a proposal." 810 ILCS Ann. 5/9-620, Uniform Commercial Code Comment 5 (Smith-Hurd 2022). Nothing in the record suggests an agreement on accepting the collateral in full or partial satisfaction of the obligation.

¶ 36　　　　Thus, we find no support in the UCC for the guarantors' illogical Catch-22 interpretation.

¶ 37　　　　　　　　　　　　Commercial Reasonableness

¶ 38　　　　The guarantors argue the trial court erred in considering whether First American's decision to retain the TIF note was commercially reasonable. According to the guarantors, commercial reasonableness is irrelevant when a creditor has two choices—selling the collateral or accepting it to satisfy the debt. As noted, the UCC does not impose that choice. (At oral argument, counsel arguing for the guarantors conceded that our adopting their position would make new law.) Moreover, under section 9-607, a secured creditor must act in a commercially

reasonable manner when enforcing and collecting a security interest. 810 ILCS 5/9-607(c) (West 2022).

¶ 39   Based on the testimony of the experts and the evidence, the trial court did not abuse its discretion in finding that First American acted in a commercially reasonable manner by retaining the TIF note.

¶ 40   First American's expert opined that a nonrecourse note, like the TIF note, has "no liquid public market" because the Village was not obligated to pay principal or accrued interest at the end of the agreement. The guarantors' expert, Howard Samuels, never placed a value on the TIF note, opining it could be sold because "there's a market for anything and everything." When reminded that the Village had no obligation to pay out the principal on the TIF note, Samuels responded that he believes something has value until he is "told from somebody *** that it doesn't." Despite stating that the market would determine the value of the TIF note, Samuels acknowledged he did not attempt to determine what a buyer would pay for a TIF note on which the Village had no obligation to make payments.

¶ 41   The guarantors also contend that the trial court ignored relevant cases that have held retaining collateral is not commercially reasonable. But none of the cases involve collateral that, as here, is a nonrecourse note. For instance, in *In re Nardone*, 70 B.R. 1010 (Bankr. D. Mass. 1987), the debtor used a health spa's equipment to partly secure a $50,000 loan. When the debtor went out of business, the creditor continued to operate the health club under a different name using the collateral. *Id.* at 1012. The bankruptcy court found that, by retaining collateral that equaled or exceeded the debt, the creditor violated a statute requiring a creditor to dispose of collateral in a commercially reasonable method, manner, time, and place. *Id.* at 1017.

¶ 42    Similarly, in *H.V. Funding, Inc. v. Ernest Vakkas & Sons, Inc.*, 531 N.Y.S.2d 484 (Dist. Ct. 1988), after a defendant who leased phone equipment defaulted, the plaintiff repossessed and retained the equipment and sought the balance due under the lease. The trial court found this violated the UCC by not disposing of the equipment in a commercially reasonable manner after notice to the debtor. *Id.* at 486.

¶ 43    Unlike *Nardone* and *H.V. Funding*, the TIF note's value does not equal or exceed the debt. Indeed, based on the expert witnesses' deposition testimony, it had almost no fair market value, as the Village did not have to make payments on it. The note's value solely depended on the annual interest payments the Village paid to First American until the note expired. Thus, First American's decision to retain the TIF note, collect interest payments, and apply them to the debt was commercially reasonable.

¶ 44    Also without merit is the guarantors' contention that First American's retention of the TIF note created a rebuttable presumption that its value was equal to the judgment. The guarantors rely on section 9-626 of the UCC (810 ILCS 5/9-626 (West 2022)). Under that section, when a deficiency exists and the secured party fails to prove collection, enforcement, disposition, or acceptance was conducted in accord with the UCC, "the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum." *Id.* § 9-626(4). Based on the evidence, the TIF note was worth no more than the remaining interest payments, discounted for time and risk. Thus, the trial court did not abuse its discretion in holding that First American did not have to sell the TIF note and that retaining it did not satisfy the judgment.

¶ 45    Principles of Equity

¶ 46      The guarantors contend that, the UCC aside, principles of equity require First American's decision to retain the TIF note to qualify as satisfying the judgment. For support, the guarantors primarily rely on *Heller v. Lee*, 130 Ill. App. 3d 701 (1985), and *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439 (2009). But in both *Heller* and *International Supply*, the courts determined that retaining collateral that had value *and* seeking to enforce the judgment constituted a windfall. First American has not obtained a windfall because the amount owed far exceeds the TIF note's meager (at best) value.

¶ 47      In *Heller*, after the trial court entered a monetary judgment for the plaintiff, the defendant posted an appeal bond consisting of a deed to real property and a certificate of deposit. *Heller*, 130 Ill. App. 3d at 702. After the bond was released, the plaintiff received the certificate of deposit and took title to the property but only applied the value of the certificate of deposit against the judgment. The plaintiff filed collection proceedings on the deficiency. The defendants sought release from the judgment and return of excess on the bond under section 12-813. The trial court dismissed the petition. *Id.* We found retaining the property caused "a windfall," entitling the defendants to equitable relief. *Id.* at 703. The court remanded with directions "to sell the property, apply the proceeds to the judgment, and remit the excess, if any, to the defendants." *Id.*

¶ 48      In *International Supply*, the plaintiffs assisted the defendants in securing loans for a land development in exchange for a personal guaranty and escrow of two property deeds. *International Supply*, 391 Ill. App. 3d at 441-42. After the defendants defaulted, the plaintiffs took title to the properties and sued to enforce the guaranty. On appeal, the court explained that, by taking "full ownership and control" of the collateral properties, the plaintiffs accepted

the properties "as substitute performance in full satisfaction of defendants' obligation under the personal guaranty" and were not entitled to further damages. *Id.* at 451.

¶ 49       The guarantors also argue that they expected the TIF note to satisfy the judgment. But under the TIF note and pledge, the guarantors' expectation that First American would sell the TIF note was unreasonable. The TIF Pledge agreement, which governs First American's obligation, does not obligate First American "to make any sale of the TIF note if it shall determine not to do so." And the guarantors knew the Village did not have to pay principal on the note, and after the project was abandoned, the TIF note had immensely less value than initially contemplated.

¶ 50       Payments From Other Sources

¶ 51       The guarantors contend the trial court erred in finding that First American did not have to apply payments it received from other sources toward their judgment. The guarantors argue the trial court improperly relied on the language of the guaranties in finding that First American had discretion in deciding how to allocate the payments and credits it received because, under the merger doctrine, the guaranties merged with the judgment.

¶ 52       Looking first to the guaranties, they gave First American authority to apply payments toward the debt "in such order *** as the Bank may from time to time elect." So, the guaranties did not require First American to first apply the payments toward the judgments.

¶ 53       Under the merger doctrine, when a court enters a judgment on a contract or other instrument, the instrument merges into the judgment, loses all of its vitality, and ceases to bind the parties to its execution. *Poilevey v. Spivack*, 368 Ill. App. 3d 412, 414 (2006) (citing *Doerr v. Schmitt*, 375 Ill. 470, 472 (1941)). Once merged, the parties can maintain no further action on the instrument at law or in equity. *Id.* (citing *Doerr*, 375 Ill. at 472). The merger doctrine

applies only " 'to *causes of action* to bar relitigation of the same cause.' " (Emphasis in original.) *Id.* at 415 (quoting *Stein v. Spainhour*, 196 Ill. App. 3d 65, 70 (1990)). It "does not prevent a court from looking 'beyond the judgment to see upon what it is founded, to give the judgment its just effect.' " *Id.* at 416 (quoting *Meeker v. Gray*, 142 Ill. App. 3d 717, 726 (1986)).

¶ 54    In *Stein*, the court found that the merger doctrine did not apply because the plaintiff's claim did not relitigate the defendant's liability under the contract but, instead, "sought attorney fees which are ancillary to the primary cause of action." *Stein*, 196 Ill. App. 3d at 70. Similarly, in denying the guarantors' section 12-183 petition, the trial court did not relitigate their liability but gave effect to the judgment based on their guaranties. So, the merger doctrine did not prevent the trial court from looking at the language of the guaranties.

¶ 55    Finally, the guarantors do not cite authority holding that, in collecting on a debt, a creditor must first apply payments it receives toward a judgment against guarantors. The cases they rely on are factually distinguishable, involving the long-standing rule against double recovery. See *Marks v. L.C.J. Construction Co.*, 89 Ill. App. 3d 418, 421 (1980) (assignment of judgment to strawman purchaser discharged judgment because it was paid in full to person authorized to receive it); *Popovich v. Ram Pipe & Supply Co.*, 82 Ill. 2d 203, 209 (1980) (refusing to give effect to loan agreement to extent that it would have allowed double recovery). Double recovery, however, is not an issue.

¶ 56                              Comment on Parties' Briefs

¶ 57    The language and tone of the briefs at times veered into the hyperbolic and combative. We are aware this case has a long history and that counsel have vigorously represented their clients'

interests. Effective advocacy, however, never warrants impertinence, which is counterproductive and distracting.

¶ 58        Affirmed.

*First American Bank v. Poplar Creek, LLC*, 2024 IL App (1st) 230551

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-14974; the Hon. Patrick J. Heneghan, Judge, presiding. |
| **Attorneys for Appellant:** | Timothy R. Herman, of Clark Hill PLC, of Chicago, for appellant Estate of George A. Moser. |
| | Charles R. Bernardini and Seth A. Horvath, of Nixon Peabody LLP, of Chicago, for appellant Douglas C. Altenberger. |
| | Cornelius P. Brown and Amy E. Daleo, of Cohon Raizes & Regal LLP, of Chicago, for other appellant. |
| **Attorneys for Appellee:** | Neal H. Levin, of Rimon P.C., and Shira R. Isenberg, of Smith, Gambrell & Russell, LLP, both of Chicago, for appellee. |